671 N.E.2d 668 (1996)
173 Ill.2d 299
219 Ill.Dec. 501
AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, Appellee,
v.
The DEPARTMENT OF CENTRAL MANAGEMENT SERVICES et al., Appellants.
No. 79376.
Supreme Court of Illinois.
September 19, 1996.
*670 James E. Ryan, Attorney General, Springfield (Barbara A. Preiner, Solicitor General, and Jerald S. Post, Assistant Attorney General, Chicago, of counsel), for appellants.
Gilbert Feldman, Cornfield & Feldman, Chicago, for appellee.
Justice FREEMAN delivered the opinion of the court:
Plaintiff, the American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME), brought this action against defendants, the Department of *671 Central Management Services and the Department of Children and Family Services (collectively, DCFS), seeking to confirm an arbitration award and to vacate a supplemental arbitration award. 710 ILCS 5/11, 12 (West 1992). The circuit court of Sangamon County denied the requested relief, and the appellate court reversed, with one justice dissenting. 272 Ill.App.3d 814, 209 Ill.Dec. 540, 651 N.E.2d 718. We granted leave to appeal (155 Ill.2d R. 315) and now reverse the judgment of appellate court.

BACKGROUND
In December 1985, DCFS Child Welfare Specialist II Vera DuBose was assigned the case file of three minor children in DCFS's custody. In February 1990, DuBose stated in a written "uniform progress report" that she had seen the three children in February 1990 and that they were "doing fine." Unfortunately, the children had, in fact, perished in an accidental fire at their home on January 16, 1990. DuBose thereafter transferred from her DCFS regional office to another for unrelated reasons.
When DuBose's replacement conducted a "follow-up" on the children in August 1990, he learned of the children's deaths in the fire. The matter was then assigned to an internal DCFS investigator on August 22, 1990. During the internal investigation, DCFS also discovered that DuBose had failed to submit case plans for the family for the years 1988, 1989, and 1990.
The investigator completed his inquiries and submitted a written report to his superiors on December 13, 1990. No further action was taken in the matter until June 20, 1991, when DCFS informed DuBose that a "predisciplinary" meeting was scheduled for June 24, 1991. Pursuant to the terms of the collective-bargaining agreement, AFSCME was given an opportunity to rebut DCFS's presentation. In the rebuttal, AFSCME maintained that a complete and detailed statement was not possible without certain requested documentation. Moreover, AFSCME argued that disciplinary action could not be taken against DuBose in view of the "extreme time delay." After submission of the rebuttal, AFSCME received a copy of the investigator's summary report. AFSCME thereafter filed an addendum to its rebuttal, reiterating its position that any disciplinary action taken against DuBose would be untimely. On September 2, 1991, a predisciplinary report was issued, containing a recommendation that DuBose receive a 60-day suspension.
Contrary to the recommendation, DCFS notified DuBose nine days later that she was being placed on a 30-day suspension, pending a final determination of discharge. AFSCME then filed a grievance on DuBose's behalf. On October 1, 1991, DCFS notified DuBose that she was being discharged within three days for falsification of the uniform progress report and failure to prepare service plans for the children for three years as required by DCFS's internal rules. The matter then proceeded to arbitration.
At arbitration, AFSCME argued that DCFS failed to impose discipline in a timely manner, and that even if it did, DCFS did not have just cause to discharge the employee. After conducting a hearing, the arbitrator sustained the grievance and reinstated DuBose. The arbitrator ruled that DCFS had breached the parties' collective-bargaining agreement by failing to timely discipline DuBose. Moreover, the arbitrator concluded that the failure to impose discipline in a timely fashion prevented him from "address[ing] the merits of this dispute."
Rather than reinstating DuBose, DCFS applied to the circuit court of Sangamon County, seeking vacatur of the arbitrator's reinstatement award. In granting the relief, the circuit court agreed with DCFS that the reinstatement violated public policy established in the Abused and Neglected Child Reporting Act (325 ILCS 5/1 et seq. (West 1994)). The court remanded the matter to the arbitrator for a decision on the merits. The circuit court also denied AFSCME's request for certification of the issue for appeal. See 134 Ill.2d R. 308.
On remand, AFSCME "demurred," electing to stand on the arbitrator's initial decision that the disciplinary action was untimely. As a result, the arbitrator denied the grievance, noting that AFSCME's "demurral" *672 prevented him from hearing the merits of the case as directed by the circuit court.
AFSCME then filed a petition in the circuit court of Cook County, seeking to vacate the subsequent arbitration order and to confirm the arbitrator's initial award. Venue was subsequently transferred to the circuit court of Sangamon County, which, as noted, denied AFSCME's petition.
On appeal, the appellate court reversed the judgment of the circuit court, holding that the time provisions contained in the collective-bargaining agreement could not be relaxed in favor of public policy. The court noted the well-recognized policy of establishing time frames within which various types of actions must be commenced. The effects of such policy, the court reasoned, often produced harsh consequencesthe "guilty" may go free or those tortiously injured may be uncompensated. 272 Ill.App.3d at 818, 209 Ill.Dec. 540, 651 N.E.2d 718. The court concluded that the initial arbitral award, DuBose's reinstatement, merely upheld the "essence" of the collective-bargaining agreement and, as such, could not be vacated in favor of public policy.
The dissent, although acknowledging the collective-bargaining agreement's express language regarding time limits, questioned the majority's disregard of the paramount considerations of public policy. Specifically, the dissent focused upon the result created by the majority's analysis, i.e., that "DCFS must be forced to hire back some social worker no matter how egregious" the conduct. 272 Ill.App.3d at 821, 209 Ill.Dec. 540, 651 N.E.2d 718 (Steigmann, J., dissenting).
For reasons that follow, we reverse the judgment of the appellate court.

DISCUSSION
Resolution of this appeal requires that we consider whether public policy concerns may be used to override an arbitral award. DCFS argues that public policy dictates that the arbitrator's award of reinstatement be vacated because of the severity of DuBose's alleged conduct. AFSCME responds that the arbitrator's award reflects a proper interpretation of the collective-bargaining agreement, an agreement which contains certain procedures which must be followed in order for discipline to be imposed.

The Standard of Review
This court has consistently recognized that the judicial review of an arbitral award is extremely limited. American Federation of State, County & Municipal Employees v. State of Illinois, 124 Ill.2d 246, 254, 124 Ill.Dec. 553, 529 N.E.2d 534 (1988); Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600, 74 Ill.2d 412, 418, 24 Ill.Dec. 843, 386 N.E.2d 47 (1979). This standard reflects the legislature's intent in enacting the Illinois Uniform Arbitration Actto provide finality for labor disputes submitted to arbitration. See 710 ILCS 5/12 (West 1994) (denying judicial authority to vacate arbitral awards except on grounds recognized at common law). The Act contemplates judicial disturbance of an award only in instances of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration. Board of Education v. Chicago Teachers Union, Local No. 1, 86 Ill.2d 469, 474, 56 Ill.Dec. 653, 427 N.E.2d 1199 (1981). Thus, a court is duty bound to enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement. Board of Trustees, 74 Ill.2d at 421, 24 Ill.Dec. 843, 386 N.E.2d 47.
To this end, any question regarding the interpretation of a collective-bargaining agreement is to be answered by the arbitrator. Because the parties have contracted to have their disputes settled by an arbitrator, rather than by a judge, it is the arbitrator's view of the meaning of the contract that the parties have agreed to accept. We will not overrule that construction merely because our own interpretation differs from that of the arbitrator. American Federation of State, County & Municipal Employees, 124 Ill.2d at 254, 124 Ill.Dec. 553, 529 N.E.2d 534.

Application of the Standard of Review
In this case, the arbitrator based his award of reinstatement upon the fact that DCFS breached the collective-bargaining *673 agreement by failing to discharge DuBose seasonably. Article IX, section 1, of the parties' collective-bargaining agreement, which governs discipline, states in pertinent part:
"Discipline shall be imposed as soon as possible after the Employer is aware of the event or action giving rise to the discipline and has a reasonable period or time to investigate the matter.

In any event, the actual date upon which discipline commences may not exceed forty five (45) days after the completion of the predisciplinary meeting." (Emphasis added.)
In the present case, DCFS offered no explanation to the arbitrator for the seven-month interval between the conclusion of the investigation and the commencement of disciplinary proceedings. As a result, the arbitrator concluded that the delay was unreasonable and that DCFS had violated the contractual time provision. The arbitrator further ruled that the entire disciplinary proceeding was "procedurally defective" and that the only remedy appropriate under the circumstances would be reinstatement. The arbitrator rejected DCFS's argument that DuBose suffered no prejudice from the delay because the contract made timeliness a condition precedent to the imposition of discipline.
As noted, we will disturb an arbitral award only if it fails to derive its essence from the collective-bargaining agreement at issue. Significantly, the parties' agreement here does not delineate the precise time frames within which disciplinary action must be commenced. Similarly, the agreement is silent as to what remedies are available once an infraction is found. Thus, these matters were left for the determination of the arbitrator. In addition, when an agreement contemplates that the arbitrator will determine remedies for the contractual violations, courts have no authority to disagree with his honest judgment in that respect. See United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286, 299 (1987). Given the limited nature of our review, we simply may not substitute our interpretation of the time provision clause for that of the arbitrator when the arbitrator's interpretation is clearly drawn from the essence of the collective-bargaining agreement. In deed, DCFS does not dispute the arbitrator's contractual interpretation and even concedes that it violated the agreement's time provision.
What DCFS does urge, however, is that public policy dictates that the award of reinstatement be vacated in light of the circumstances of this case. AFSCME counters that public policy is not violated in this instance because the enforcement of the contract's time provisions do not violate any express public policy.

The Public Policy Exception
Courts have crafted a public policy exception to vacate arbitral awards which otherwise derive their essence from a collective-bargaining agreement. The historical context of the exception is grounded in the common law. As with any contract, a court will not enforce a collective-bargaining agreement that is repugnant to established norms of public policy. Likewise, we may not ignore the same public policy concerns when they are undermined through the process of arbitration. Board of Trustees, 74 Ill.2d at 424, 24 Ill.Dec. 843, 386 N.E.2d 47.
However, in order to vacate an arbitral award upon these grounds, the contract, as interpreted by the arbitrator, must violate some explicit public policy. American Federation of State, County & Municipal Employees, 124 Ill.2d at 261, 124 Ill.Dec. 553, 529 N.E.2d 534; W.R. Grace & Co. v. Local Union No. 759, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298, 307 (1983). In this respect, the exception is a narrow one and is invoked only when a contravention of public policy is clearly shown. American Federation of State, County & Municipal Employees, 124 Ill.2d at 261, 124 Ill.Dec. 553, 529 N.E.2d 534, citing United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 43, 108 S.Ct. 364, 373-74, 98 L.Ed.2d 286, 302 (1987). Moreover, the public policy must be "well-defined and dominant" and ascertainable "by reference to the laws and legal precedents and not from generalized considerations of supposed public interests." W.R. *674 Grace, 461 U.S. at 766, 103 S.Ct. at 2183, 76 L.Ed.2d at 307. This court has stated that it will look to our "constitution and * * * statutes, and when cases arise concerning matters upon which they are silent, then in its judicial decisions and the constant practice of the government officials" when determining questions regarding public policy. Zeigler v. Illinois Trust & Savings Bank, 245 Ill. 180, 193, 91 N.E. 1041 (1910).
Thus, application of the public policy exception requires a two-step analysis. The threshold question is whether a well-defined and dominant public policy can be identified. If so, the court must determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy. Applying these two steps, we find there is a well-defined public policy in favor of truthful and accurate DCFS reporting and that the arbitral award in this case violates that policy.

Review of Cases Applying the Public Policy Exception
The seminal case involving the exception is United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). There, the United States Supreme Court examined the role of public policy in vacating an arbitral award which reinstated an employee discharged for violation of the employer's drug policy. The employee had been arrested on company premises in another's car that was filled with marijuana smoke, and traces of marijuana were found in his own car on the company lot. The arbitrator found that there was no evidence that the employee had used drugs during working hours. The district court vacated the award on public policy grounds, and the circuit court of appeals affirmed. The Supreme Court held the reversal of the arbitral award improper because the award did not contravene public policy. Specifically, the Court faulted the circuit court of appeals for making "no attempt to review existing laws and legal precedents in order to demonstrate that they establish a `well-defined and dominant' policy." Misco, 484 U.S. at 44, 108 S.Ct. at 374, 98 L.Ed.2d at 302. Moreover, the court of appeals inappropriately drew factual inferences from evidence which had been rejected by the arbitrator. Misco, 484 U.S. at 44, 108 S.Ct. at 374, 98 L.Ed.2d at 303.
In Delta Air Lines, Inc. v. Air Line Pilots Ass'n International, 861 F.2d 665 (11th Cir. 1988), a pilot, while intoxicated, flew a commercial airliner on its scheduled flight. His employer discharged him after discovering the misconduct. Pursuant to a collective-bargaining agreement, the pilot complained that his conduct was insufficient to establish just cause for discharge. The arbitrators in that case agreed and ordered his reinstatement. A federal district court overturned the award as violative of public policy. In affirming the decision, the court of appeals noted:
"[When a] person performs his employment duties and, in doing so, violates standards, restraints and restrictions on conduct, clearly and explicitly established by the people in their laws, a requirement that the employer suffer that malperformance and not discharge the offender does itself violate the same well established public policy." (Emphasis in original.) Delta, 861 F.2d at 674.
The court of appeals stressed that the employer, Delta, was under a duty to prevent the wrongdoing of which the employee was guilty and it could not agree to arbitrate that issue. Thus, the collective-bargaining agreement, as interpreted by the arbitrator, violated public policy.
Similarly, in Iowa Electric Light & Power Co. v. Local Union 204, 834 F.2d 1424 (8th Cir.1987), a nuclear power plant employee in a hurry to leave his work area to go to lunchordered a foreman to disconnect a safety device on a doorway designed to protect the public from harmful radiation. After the employee was discharged for this misconduct, an arbitrator ordered his reinstatement. The district court overturned the award as incompatible with public safety concerns. The court of appeals affirmed, noting that Congress had established a strict nuclear regulatory scheme which the worker willingly contravened. The court concluded that the worker could "no longer * * * be trusted to work in such a critical environment when *675 he shows no respect for the safety implications of his actions and when he is willing to jeopardize the safety of the public." Iowa Electric, 834 F.2d at 1429. See also United States Postal Service v. American Postal Workers Union, 736 F.2d 822, 825 (1st Cir. 1984) (vacating, on public policy grounds, an award reinstating postal worker convicted of embezzling postal funds because the offense "went to the heart of the worker's responsibilities," and because the employee "represented a branch of the federal government and was imbued with the public trust. His actions directly violated that trust").
We have previously considered whether the public policy exception may be used to vacate an arbitral award in American Federation of State, County & Municipal Employees v. State of Illinois. There, this court was presented with the case of two mental health technicians who were away from their workplace, a facility for the mentally disabled, for an unauthorized time. While they were away, an unattended patient at the facility died. The patient, however, was not assigned to the ward where the technicians should have been on duty. For this reason, among others, the arbitrator reduced their subsequent discharges for conduct constituting mistreatment of a mental health recipient to mere suspensions.
In upholding the award, this court rejected the Department of Mental Health's public policy argument, mainly because it could not identify a well-defined and dominant public policy:
"There is simply no policy that mandates the discharge of all employees found guilty of mistreatment of a service recipient when the arbitrator expressly finds that the grievants were exemplary mental health employees, when punishment has been imposed, and where no nexis [sic] exists between the infraction and the patient's tragic death." American Federation of State, County & Municipal Employees, 124 Ill.2d at 262-63, 124 Ill.Dec. 553, 529 N.E.2d 534.
In contrast, our appellate court has invoked the public policy exception to vacate an arbitral award which reinstated a school bus driver whose unsafe driving had caused her discharge. The court identified a dominant and well-defined public policy favoring the safe transportation of school children and held that the reinstatement of an unsafe driver would contravene that policy. Board of Education of School District U-46 v. Illinois Educational Labor Relations Board, 216 Ill.App.3d 990, 159 Ill.Dec. 802, 576 N.E.2d 471 (1991).
Finally, the appellate court has vacated an arbitral award in which a DCFS worker was discharged from and then reinstated to her position after falsifying a case report concerning the veracity of a report of child abuse, a factual situation somewhat akin to that presented here for review. The arbitrator found that discharge violated the collective-bargaining agreement's "progressive discipline" provision. Finding that the safety and well-being of children required "zealous" investigation and "honest" reporting, the appellate court held that the worker's reinstatement to her former position violated that explicit public policy. See Department of Central Management Services v. American Federation of State, County & Municipal Employees, 245 Ill.App.3d 87, 98, 185 Ill.Dec. 379, 614 N.E.2d 513 (1993).
The above cases demonstrate that although a rote recitation of the exception's two-prong test can be easily made, the exception's ultimate applicability to a case is necessarily fact dependant. With these principles in mind, we turn to the facts of the present case.

Statutes and Legal Precedents
To be sure, the welfare and protection of minors has always been considered one of the State's most fundamental interests. This court long ago acknowledged the right and duty of the General Assembly to legislate for the protection and welfare of its minors:
"[I]t would be a sad commentary on our State government, if it is true, as is contended, there is no constitutional power in the legislature to provide, by suitable legislation, for [minors'] education, control and protection. It is the unquestioned right and imperative duty of every enlightened *676 government, in its character of parens patriae, to protect and provide for the comfort and well-being of such of its citizens as, by reason of infancy, defective understanding, or other misfortune or infirmity, are unable to take care of themselves. The performance of this duty is justly regarded as one of the most important of governmental functions, and all constitutional limitations must be so understood and construed as not to interfere with its proper and legitimate exercise." County of McLean v. Humphreys, 104 Ill. 378, 383 (1882).
This public policy has led our courts to recognize that even parents' rights are secondary to the State's strong interest in protecting children when the potential for abuse or neglect exists. See, e.g., Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); In re Wheat, 68 Ill.App.3d 471, 477, 25 Ill.Dec. 7, 386 N.E.2d 278 (1979). Moreover, the legislature has the right to provide the "necessary instrumentalities or agencies" for the accomplishment of its goals in preventing abuse and neglect. Humphreys, 104 Ill. at 384.
DCFS is one such created agency, and it plays a central role in implementing this compelling state interest. The General Assembly specifically charged it to protect and promote the welfare of the children of this state. 20 ILCS 505/1 (West 1992); In re C.J., 166 Ill.2d 264, 270, 209 Ill.Dec. 775, 652 N.E.2d 315 (1995). Recognizing such protection and promotion necessitates both investigation of and contact with those children and families who need assistance, the legislature empowered the agency to make any investigations it deems necessary to perform its duties. 20 ILCS 505/21 (West 1992). To that end, the agency employs "child welfare specialists" who are trained in (i) detection of symptoms of child neglect and drug abuse; (ii) dealing with families and children of drug abusers; and (iii) child development, family dynamics and interview techniques. 20 ILCS 505/21 (West 1992). The legislature also gave the agency the power to make any rules "necessary for the execution of its powers" and expressly adopted the regulations it promulgates under the Illinois Administrative Procedure Act as part of the Children and Family Services Act. 20 ILCS 505/4 (West 1992).
In order to identify the "well-defined and dominant" public policy implicated in the present case, we must examine DCFS's specific duties as they related to the three children assigned to DuBose at the time of the incident. DCFS became involved with the family as a result of a report of abuse in the children's home made under the Abused and Neglected Child Reporting Act (325 ILCS 5/1 et seq. (West 1992)). The Abused and Neglected Child Reporting Act contemplates that once grounds for temporary removal from the home are indicated, all subsequent proceedings are to be made pursuant to article II of the Juvenile Court Act. See 325 ILCS 5/7.14 (West 1992). Accordingly, DCFS is required by legislative fiat to "assist a Circuit Court during all stages of the court proceedings in accordance with the purposes of this Act and the Juvenile Court Act of 1987." 325 ILCS 5/8.3 (West 1992). We note that the General Assembly has amended this statute during the pendency of these proceedings. See Pub.Act 88-310, § 5, eff. January 1, 1994. The section currently provides that DCFS assist the circuit court by "providing full, complete, and accurate information to the court" and that the "[f]ailure to provide assistance requested by a court shall be enforceable through proceedings for contempt of court." (Emphasis added.) See 325 ILCS 5/8.3 (West 1994).
DCFS subsequently classified the report of abuse initially made in this case as "indicated" (see 325 ILCS 5/7.14 (West 1992)), and pursuant to the Juvenile Court Act, the circuit court placed the children in the agency's custody. 705 ILCS 405/2-10 (West 1992). In such circumstances, DCFS is then required to develop an appropriate service plan for the family. 325 ILCS 5/8.2 (West 1992). Thereafter, the children's custody may be modified in a number of ways, one of which includes placement with a relative. 705 ILCS 405/2-10 (West 1992). Here, custody of the children was transferred to their maternal grandmother in accordance with their mother's wishes. See 705 ILCS 405/2-27 (West 1992) (allowing juvenile court to place a ward of the court with relative if parents *677 are unable to care for, protect, train, or discipline the minor and family preservations services are unsuccessful). That transfer resulted in the grandmother's being made the "legal guardian" of the children. 705 ILCS 405/2-27(3) (West 1992).
The creation of such a legal guardianship in this case, however, ended neither the juvenile court's involvement with the children nor that of DCFS. That is because the guardianship at this stage is not considered permanentit is always subject to modification and review of the court. 705 ILCS 405/2-27(6), 2-28 (West 1992). In fact, DCFS is still required by law to "provide appropriate services to, any family whose child has been placed in substitute care." 20 ILCS 505/5(l) (West 1992). In response to the General Assembly's requirement that DCFS "establish rules and regulations concerning its operation of programs" with regard to placement under section 2-27 of the Juvenile Court Act (20 ILCS 505/5(g)(9) (West 1992)), the agency promulgated rules which require service plans be made at least every six months for the child and the family regardless of whether they are served directly by DCFS. See 89 Ill.Adm.Code § 305.5 (1989). In the context of placement of abused or neglected children under the Juvenile Court Act, the obligation to develop such case plans serves to fulfill the legislative goal of moving the child "toward the most permanent living arrangement and permanent legal status." 20 ILCS 505/6a (West 1992). Thus, the plans are to be reviewed and updated every six months. 20 ILCS 505/6a (West 1992).
Moreover, to facilitate the juvenile court's review, the legal guardian is also required by law to file case plans with the court every six months. 705 ILCS 405/2-28(2) (West 1992). Specifically, the General Assembly has mandated that DCFS:
"shall review the forms * * * returned by each * * * guardian and supplement the information provided therein, where required, by such additional consultations with the * * * guardian and such other investigations as may be necessary and, applying the standard and regulations established by the Department, shall determine whether and the extent to which, the parent or guardian or together in any combination, are reasonably able to provide parental payment for care and training of their children." (Emphasis added.) 20 ILCS 505/9.4 (West 1992).
Once the child has been placed pursuant to section 2-27 of the Juvenile Court Act, the next step in the proceedings is either a termination of the parental rights with adoption to follow, or a reunification with the biological parents. See 705 ILCS 405/2-28(1) (West 1992). The court, however, will not discharge a minor or officially "close" the case until it specifically finds that it is in the best interests of the minor to do so and that the public no longer has an interest in keeping the case in the system. 705 ILCS 405/2-30 (West 1992).
It is worth pointing out at this point in our discussion that these placement proceedings represent just a portion of the comprehensive legislative scheme designed for the welfare and protection of children found to be abused or neglected. We focus on this stage only because it was in this context that DuBose reported that she had seen the children and that they were "doing fine." Her uniform progress report, intended for submission to the juvenile court, also contained her statement that one of the minor children had told her that she "liked" living with her grandmother and other siblings. Although we recognize that there is less likelihood that the child is still threatened with abuse or neglect because the child has been removed from the harmful environment, the court's concentration remains fixed upon that child's safety and welfare. This is because the placement is only temporary in nature. The decisions which the juvenile court is mandated by statute to render in this area require accurate reporting, honest evaluation, and personal observation of both child and guardian on the part of the trained child welfare specialist assigned to the case. Indeed, DCFS's continued involvement with the placed child at these proceedings reveals the General Assembly's recognition of reality: it is the specialist, not the trial judge, who is versed in the areas of child development and family dynamics. Honesty and zealousness are essential in order to guarantee that the *678 permanent placement with the guardian or the restoration of parental rights is indeed in the best interests of a child whose life has already been disrupted by abuse and/or neglect.
We, therefore, have little difficulty in concluding that there exists a "well-defined and dominant" public policy against DCFS's employment of individuals whose dishonesty and neglect could seriously undermine the welfare, safety, and protection of minors. The statutes we have cited cannot, in any way, be viewed as mere "general considerations of supposed public policy" concerning the proper placement of children whose lives have already been disrupted by abuse and/or neglect. That no harm apparently resulted to the children from this inaccurate representation and the apparent three-year neglect is hardly comforting. Nor should it be the yardstick by which application of the public policy exception is measured. Our identification of this public policy also augments the appellate court's conclusion in Department of Central Management Services v. American Federation of State, County & Municipal Employees, 245 Ill.App.3d 87, 97, 185 Ill.Dec. 379, 614 N.E.2d 513 (1993), that there exists a public policy of both timely contact with the children and accurate documentation of investigations necessary for DCFS to fulfill its legislative mandate of investigating claims of suspected child abuse and neglect.

Conflict with Public Policy
Our inquiry must next focus upon whether the contract in this case, as interpreted by the arbitrator, clearly violates that policy. We are mindful of the fact that the foregoing public policy conflicts with the policy inherent in providing for time limits within which disciplinary charges or claims may be brought. However, the State's interest in its children's welfare and protection must override AFSCME's concerns for timeliness. In certain cases, interpreting the time provisions as the arbitrator did in this case and ordering reinstatement will not contravene the public policy enunciated above. Mere charges of tardiness, standing alone, would not contravene that public policy. However, the manner in which the time provision was enforced in this case with respect to the misconduct at issue cannot be upheld. As with any limitation, the nature of the conduct at issue must be considered before arbitrary time restrictions can be imposed.
The arbitrator's remedy for the violation of the contract's time provision caused him to fully reinstate a DCFS child welfare specialistcharged with both falsifying a uniform progress report intended for submission to the Juvenile Court and neglecting to compile required family service plans for three yearswithout any determination that the welfare of the minors in the DCFS system will not be compromised by such a reinstatement. Rather, he avoided discussion of the charges against DuBose. He did not take any precautionary steps to ensure the misconduct at issue here will not be repeated, and he neither considered nor respected the pertinent public policy concerns that arose from them. Thus, the remedy in this case violates public policy in that it totally ignores any legitimate public policy concerns.
As with any contract, a court may not enforce a collective-bargaining agreement in a manner that is contrary to public policy. Accordingly, if an arbitrator construes such an agreement in a way that violates public policy, an award based on that construction may be vacated by a court. W.R. Grace, 461 U.S. at 766, 103 S.Ct. at 2183, 76 L.Ed.2d at 307. Questions of public policy, of course, are ultimately left for resolution by the courts. Board of Trustees, 74 Ill.2d at 424, 24 Ill.Dec. 843, 386 N.E.2d 47; see also W.R. Grace, 461 U.S. at 766, 103 S.Ct. at 2183, 76 L.Ed.2d at 307. Even if the arbitrator had considered issues of public policy, "we may not abdicate to him our responsibility to protect the public interest at stake." Board of Trustees, 74 Ill.2d at 424, 24 Ill.Dec. 843, 386 N.E.2d 47. We believe the public policy identified above is violated by the arbitral award in this case. That award cannot be said to in any way promote the welfare and protection of children. DCFS, in agreeing to a time provision that does not allow for exigent disciplinary circumstances, has compromised its ability to discharge its duties as expressed by the General Assembly.
*679 Thus, we believe the appellate court's likening of the parties' contractual time provision to our criminal statutes of limitation is flawed. Such statutes, as enacted by the legislature, embody the public's regard of the seriousness of the conduct in issue. Although certain crimes do carry statutes of limitation within which prosecution must be commenced, some crimes such as treason, arson, forgery, first and second degree murder, involuntary manslaughter, and reckless homicide do not. 720 ILCS 5/3-5(a) (West 1992). Therefore, the people of this state, through the General Assembly, have recognized that certain conduct is never subject to time limitations and may be prosecuted at any time, no matter the "staleness." We cannot compare such statutory provisions with the time provision contained in the collective-bargaining agreement at issue here, particularly where the agreement applies to employees of a state agency charged with particular responsibilities which represent the will of the public with respect to the welfare and protection of children.
That said, we do not lightly disregard the right of the parties to privately negotiate their contracts. Nor do we attempt to restrain them in any way from so acting in the future. However, where public employment is at issue and that employment concerns the welfare and protection of minors, this court must balance these competing, positive policies so that the two can co-exist harmoniously and the public can reap the benefits from both.
Likewise, we find the analogy to the statutes of limitation governing civil actions between citizens unpersuasive because we are not dealing with private claims here, but claims arising from employment with an agency which represents the State and derives its duties from the General Assembly. Case law teaches us that in matters concerning child abuse and neglect, even a parent's rights yield to the State's interest in protecting its children. Although the timeliness provision of the contract is laudatory and espouses the concepts inherent in our government's disapproval of "stale claims," it, too, must yield to the public's interest in the welfare and protection of abused and neglected children.
Nevertheless, AFSCME contends that the award of reinstatement here does not violate public policy because there is no positive law which forbids DCFS from rehiring a worker in DuBose's situation. We acknowledge that the United States Supreme Court left unanswered the question of whether only a precise violation of a positive law, caused by the award itself, is necessary before a court may vacate the award on public policy grounds. As a result, the federal circuit courts of appeals have taken different views on the matter. Compare United States Postal Service v. National Ass'n of Letter Carriers, 810 F.2d 1239 (D.C.Cir.1987) (upholding reinstatement of postal carrier convicted of unlawful delay of mail because there was no legal proscription against reinstatement of such employee), with United States Postal Service v. American Postal Workers Union, 736 F.2d 822 (1st Cir.1984) (vacating reinstatement of postal employee who had been convicted of embezzlement of postal funds on public policy grounds despite no legal proscription against rehiring such employees). However, in cases where the safety and welfare of third persons is compromised, the results are more consistent. See Exxon Shipping Co. v. Exxon Seamen's Union, 11 F.3d 1189 (3d Cir.1993) (vacating arbitral award which reinstated seaman discharged for intoxication while on duty); Amalgamated Meat Cutters & Butcher Workmen of North America AFL-CIO, Local Union 540 v. Great Western Food Co., 712 F.2d 122 (5th Cir.1983) (vacating arbitral award which reinstated driver who drove employer's truck while drunk). In this case, we need not elaborate as to the potential tragedies which can result from even one false DCFS case report.
We believe that a bright-line test requiring that the award itself violate an explicit law has the potential to swallow the public policy exception. Indeed, this case illustrates why such a narrow view is unworkable. None of the acts enacted by the legislature concerning DCFS contain any statute which explicitly prohibits the agency from hiring "dishonest" workers or workers *680 previously disciplined for dishonesty. True, too, there is no statute which expressly prohibits a DCFS worker from submitting a false case report. Such prohibitions are absent because the very essence of the acts presupposes that only trustworthy workers will be hired. The employment of any other type of worker defeats the legislative purpose surrounding the entire statutory scheme. That DCFS caseworkers be diligent and truthful is not a "general consideration[] of supposed public interests." Given their statutory mandates, truthfulness, diligence, and honesty are implicit in their duties. For DCFS to employ an untrustworthy child welfare specialist violates these implied mandates. For these reasons, we decline AFSCME's invitation to adopt such a rigid rule in cases where public policy is at issue.
We also disagree with AFSCME's contention that the contractual time provision at issue here protects "industrial due process" and, as such, must be upheld. Courts have defined "industrial due process" as merely requiring employers to give employees advance notice of and an opportunity to respond to the charges against them before discipline is imposed. See Stroehmann Bakeries, Inc. v. Local 776, 969 F.2d 1436 (3d Cir.1992) (and cases cited therein). DuBose received both notice and an opportunity to be heard; therefore, industrial due process, as defined by our courts, has been satisfied in this case. Moreover, some courts have recognized that the "just cause" provisions found in many collective bargaining agreements also trigger analyses in terms of industrial due process. See, e.g., Chauffeurs Local Union No. 878 v. Coca Cola Bottling Co., 613 F.2d 716, 718 (8th Cir.1980). Indeed, "just cause," like the time provision at issue here, is a "condition precedent" to discipline. However, that has not prevented courts from vacating, on public policy grounds, reinstatements based upon the lack of "just cause." We stress that our decision should not be interpreted as denigrating either the notion or importance of industrial due process in the day-to-day administration of labor contracts in the workplace. We simply fail to see any violation of the concept in the present case.
Finally, AFSCME submits that if we were to overturn the arbitral award, we would be encouraging employers to ignore the bargained-for rights that employees have earned through the collective-bargaining agreement. We disagree. Nothing in our decision restrains an arbitrator from imposing sanctions against employers who violate a contractual provision. The arbitrator remains free to determine appropriate remedies within the confines of the collective-bargaining agreement. As the Eighth Circuit Court of Appeals has stated:
"As long as the arbitrator's remedy is `rationally explainable as a logical means of furthering the aims of the contract' [citation], the arbitrator may for example, impose monetary penalties, order the [employer] to reimburse the employee for rehabilitation programs, order reinstatement of the employee to a position in which he poses no danger to the public, or create its own unique sanction to deter overreaching by the employer." Union Pacific R.R. Co. v. United Transportation Union, 3 F.3d 255, 263 (8th Cir. 1993).
In fact, as long as the arbitrator makes a rational finding that the employee can be trusted to refrain from the offending conduct, the arbitrator may reinstate the employee to his or her former job, and we would be obliged to affirm the award. See American Federation of State, County & Municipal Employees, 124 Ill.2d at 263, 124 Ill.Dec. 553, 529 N.E.2d 534 (upholding arbitrator's reinstatement despite public policy arguments because arbitrator found employees were "exemplary," some punishment had been imposed, and the conduct at issue did not threaten patient safety). Accord Northwest Airlines v. Air Line Pilots Ass'n, International, 808 F.2d 76 (D.C.Cir.1987) (upholding reinstatement of pilot who flew commercial airliner while drunk because reinstatement was conditioned upon the pilot's recertification by the Federal Aviation Administration); E.I. DuPont de Nemours & Co. v. Grasselli Employees Independent Ass'n of East Chicago, Inc., 790 F.2d 611 (7th Cir.1986) (upholding reinstatement of *681 employee discharged after mental breakdown at work because arbitrator specifically found that recurrence of mental illness was unlikely so that worker safety was not comprised). However, the arbitrator's freedom in fashioning an appropriate remedy is not without limitation, as this case amply demonstrates. Where, as here, an arbitrator awards full reinstatement as a remedy for the contractual violation without any findings that the worker poses no risk to the welfare and protection of DCFS's children and their families, the award simply cannot stand. For the reasons stated earlier in this opinion, the full measure of the arbitrator's discretion must always yield to public policy.
Accordingly, we must decide the proper disposition of this case given our conclusions as to the public policy identified and the arbitral award of reinstatement. AFSCME's demurrer at the second arbitration hearing has complicated our review of the case in that AFSCME contends throughout its brief that the employee has never been found guilty of any of the conduct alleged by DCFS. Specifically, AFSCME argues that "in the absence of a finding by the [a]rbitrator that the employee was guilty of misconduct, there is no basis for an argument predicated on public policy." Although such an argument may be justified in the name of zealous advocacy, we find it to be a perversion of the record. The procedural history of this case reveals that AFSCME, by its own actions, prevented the arbitrator from making any such findings.
The original circuit court order in this case stated the following:
"Plaintiff's Petition to Vacate the Arbitrator's Award and Remand to the Arbitrator for a hearing on the Merits is granted as the Arbitrator's Award is contrary to public policy of this State as set forth in the Abused and Neglected Child Reporting Act." (Emphasis added.)
AFSCME then requested the circuit court to certify the issue regarding public policy and the timeliness provision under Supreme Court Rule 308 for purposes of an interlocutory appeal. The circuit court denied the request. Thus, because the court found that the case did not involve a question of law as to which there was a substantial ground for difference of opinion and that an immediate appeal would not materially advance the ultimate termination of the litigation, AFSCME was obligated to return to the arbitrator for a hearing on the merits, as ordered by the circuit court.
Notwithstanding the above order, AFSCME elected not to proceed with a hearing on the merits. Rather, AFSCME submitted the following to the arbitrator upon remand:
"The Union has decided to interpose a demurrer on the basis of the time-limits provision in the contract as interpreted and applied in your vacated award. Rather than arguing the merits, we will stand on the first award.
The time-limits provision was predicated upon the agreement of the parties that it would violate an employee's due process rights to require the employee to defend herself against State charges as in the present case. [The circuit court] in effect has found either that the State cannot agree to such a due process protection or that it cannot be applied to the instant case. His order fails to explicate his reasoning for applying the public policy doctrine.

Accordingly, the Union will not offer a defense to the State's charges and its claim that they warrant discharge. It is our position that, to do so, would severely prejudice Ms. DuBose's right to legally challenge [the circuit court's] order vacating your award.
Under these circumstances, [the Union] submits that you have no authority under the Court order but to deny the grievance, recognizing that the Union has elected to stand on its rights under the earlier award." (Emphasis added.)
In the arbitrator's supplemental arbitral order following the remand from the circuit court, he reasoned that AFSCME, by way of its "demurrer," had withdrawn all of its remaining arguments to the discharge, including the issue of just cause. This is an apt conclusion given the fact that the demurrer states that AFSCME specifically stood on *682 "the time-limits provision of the contract, as interpreted and applied in [the arbitrator's] vacated award." (Emphasis added.) The arbitrator concluded that "there is no longer anything before me to decide. If a party chooses to no longer press a position, I cannot compel it to do so." Thereafter, the arbitrator denied the grievance in the following language:
"Given [the circuit court's] order, the parties' positions prompted by the procedural posture of this matter, the Union's demurrer and notwithstanding my prior award sustaining the grievance, and recognizing that the Union has elected to stand on its rights under the earlier award, the grievance is now denied based upon the Union's demurrer."
The circuit court confirmed the supplemental arbitral order, and AFSCME appealed to the appellate court, which reversed the court's confirmation and reinstated the initial arbitral award.
Thus, the case comes to us in a somewhat unusual procedural posturethe common law "demurrer," as such, no longer exists in Illinois, the General Assembly having abolished it over 60 years ago. See Ill.Ann.Stat., ch. 110, par. 2-615, Joint Committee Comments [1955], at 407 (Smith-Hurd 1983). After the enactment of the Civil Practice Act, the demurrer evolved into what is now recognized as a motion to dismiss under section 2-615(e) of the Code of Civil Procedure (735 ILCS 5/2-615(e) (West 1992)). Such a motion raises the question of the sufficiency of the pleadings, as a matter of law, and admits the pleadings solely for purposes of deciding the legal question. However, once that legal question has been answered and rejected, and a circuit court orders the case to be heard on the merits, the time to demur on the pleadings has passed. See generally 735 ILCS 5/2-1301(b) (West 1992).
Here, AFSCME requested the arbitrator, and later the circuit court, to rule on DCFS's failure to impose discipline in a timely fashion. Although the arbitrator agreed with AFSCME that the discipline was not imposed "as soon as possible," the circuit court rejected that contention and ordered the case to be heard on the merits. Thus, in the absence of some other defensive pleading attacking DCFS's allegations, the case was no longer at the pleading stage, and AFSCME was not entitled to reiterate its previously rejected position by way of a demurrer. In this context, AFSCME's demurrer served only as a withdrawal of all of its other challenges to the discharge. Put another way, those challenges were abandoned.
We further note that AFSCME's contention that it had to "preserve" its argument regarding the "as soon as possible" language because the circuit court had denied its request for Rule 308 certification is disingenuous. Although the circuit court's order was nonfinal for purposes of appeal, an appeal from a subsequent final judgment "`draws in question all prior non-final orders and rulings which produced the judgment.'" Burtell v. First Charter Service Corp., 76 Ill.2d 427, 433, 31 Ill.Dec. 178, 394 N.E.2d 380 (1979), quoting Elfman Motors, Inc. v. Chrysler Corp., 567 F.2d 1252, 1253 (3d Cir. 1977). The denial of Rule 308 certification does not render the issue nonappealable after a subsequent entry of a final judgment. Accordingly, there was no danger that the issue of timeliness would not be preserved for later appellate review.
AFSCME's abandonment of its remaining challenges to the discharge leaves this court with the sole issue of whether the arbitrator's remedy for the violation of the "as soon as possible" contractual languagea "blanket" reinstatementviolates public policy. We have found that it does. Because AFSCME has stood on the arbitrator's application of the "as soon as possible" language, all of its remaining contentions have been waived, and a full hearing as to those contentions is no longer appropriate. AFSCME had the opportunity to make a record before the arbitrator on these remaining contentions in order to preserve them, but willingly chose not to do so. It cannot now change its stance. See Leffler v. Browning, 14 Ill.2d 225, 228, 151 N.E.2d 342 (1958).
AFSCME further maintains that this court must remand the case to the arbitrator on a limited basis for reconsideration of a remedy for DCFS's violation of the "as *683 soon as possible" language. In other words, if a remand for a hearing on the merits is not possible, then this court should nevertheless remand the matter for a redetermination of the appropriate remedy. We find this request to be tenuous at best.
First, AFSCME is now asking this court for reconsideration of the appropriate remedy despite the fact that it had previously indicated to the arbitrator that it was prepared to "stand on the [arbitrator's] first award." Second, nothing in this case prohibited AFSCME from trying the case on the merits, and then, once the arbitrator determined all of the factual questions, requesting that an appropriate remedy be fashioned. Finally, the possibility of a remand for redetermination of a different remedy based solely on the failure to impose timely discipline has already been precluded by the arbitrator's interpretation of the "as soon as possible" language, an interpretation AFSCME specifically "stood" on.
Indeed, in construing the contractual provision at issue, i.e., "[d]iscipline shall be imposed as soon as possible after the Employer is aware of the event or action giving rise to the discipline and has a reasonable period or time to investigate the matter," the arbitrator discussed various remedies which he could utilize to give effect to the provision. The arbitrator reviewed other arbitral decisions in which delay was found and discipline nonetheless was imposed. He rejected, however, the notion that any other remedy absent a blanket reinstatement was appropriate. Specifically, the arbitrator stated at length:
"The answer to the remedy question in this case comes from the parties' negotiated words. * * * If discipline is not imposed `as soon as possible', the merits of the discipline cannot be addressedno matter how egregious the alleged misconduct may be. * * *
* * * * * *
* * * The result of my conclusion is simple and provides stability. Most importantly, my conclusion follows the clear language of the Agreement and is what the parties agreed to.
* * * Given that the discipline has been found to be invalid, the only remedy is that Grievant must be reinstated to her former position without loss of seniority and other rights and benefits and she shall be made whole for all lost compensation." (Emphasis added.)
Thus, the arbitrator specifically adopted an "all or nothing" approach as a remedy for a violation of the timeliness provision, to the exclusion of all other remedies. This approach is analogous to that taken by courts when ruling on motions to dismiss based upon statutes of limitations. If an action is not timely filed, the only remedy is dismissal of the entire cause of action without any determination of the merits. Here, the arbitrator reasonably interpreted the timeliness provision to admit of no other remedies but a blanket reinstatement without reaching the merits of the case. He, rightly or wrongly, explicitly rejected imposing any other remedy.
Accordingly, we cannot order a remand even if we were to disagree with the arbitrator's honest judgment as to the unavailability of other remedies. See Misco, 484 U.S. at 38, 108 S.Ct. at 371, 98 L.Ed.2d at 299. Indeed, such action on our part would severely undermine the role of judicial review in the arbitral process. As the United States Supreme Court has stated:
"The question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424, 1429 (1960).
The Supreme Court has also advised courts not to be "suspicious" of an arbitrator's interpretation merely because an arbitrator's actions might not track those that courts would take when faced with analogous situations. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580-81, 80 S.Ct. 1347, 1351-52, 4 L.Ed.2d 1409, 1416-17 *684 (1960). In Misco, the Court again cautioned that the deference to an arbitrator's determination is high "even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." Misco, 484 U.S. at 36, 108 S.Ct. at 370, 98 L.Ed.2d at 298.
Therefore, even if we were to interpret the collective-bargaining agreement to permit other remedies which would not violate public policy in this case, our interpretation of the contract is irrelevant in the face of the arbitrator's specific conclusion that no other remedy existed. The arbitrator's factual determinations and legal conclusions generally receive deferential review as long as they derive their essence from the collective-bargaining agreement, notwithstanding the error of those factual or legal conclusions. Thus, we do not have the license to order a remand for the imposition of some other remedy when the arbitrator has specifically rejected the possibility of other remedies. We simply lack the authority to so act.
We are mindful that the public policy exception has become "a favorite pretext for those less than favorably disposed to the awards of labor arbitrators." Stead Motors v. Automotive Machinists Lodge No. 1173, 886 F.2d 1200, 1210 (9th Cir.1989). We believe that our opinion, however, strikes the proper balance between the public's interest in protecting its children, the utilization of arbitration as a means for settling labor disputes, and the proper role of the judiciary in the arbitral process. Unfortunately, the dissenting justices fail to appreciate this fact. We believe that Justice Harrison's remarks have little to do with the legal issues in this case. We further believe, with respect, the criticisms of Justices Heiple and Nickels reflect a serious misunderstanding of our opinion.
In arguing that the deaths of the three children in this case were wholly unrelated to anything Vera DuBose may have done wrong, Justice Harrison states that he "could not forget[] that dead children figure into this case." 173 Ill.2d at 337-338, 219 Ill.Dec. at 520, 671 N.E.2d at 687. However, this case is not about dead children. The case is about children who are alive today and under DCFS protection. It is those children who depend upon child welfare specialists like Vera DuBose to monitor their cases and to speak for them in the court proceedings where their neglect, abuse, and dependency are at issue and where their futures are decided. The case illustrates what happens, or could happen, if false reports are made by DCFS child welfare specialistsreports which are submitted to our circuit judges in difficult and emotional proceedings where child placement decisions are made. Serious consequences may follow if Vera DuBose fails to fulfil her statutory duty. In our view, it was DuBose's falsification of the progress report and her failure to make service plans which is the harm suffered in this case, not the fact that three children have tragically died.
Justice Harrison also chides us for waiting until now to "debut" our "compassion" for the children of this State. 173 Ill.2d at 337, 219 Ill.Dec. at 520, 671 N.E.2d at 687. Even if he were correct in his assessment of our previous decisions, which he is not, what would he have us do in this case? Perpetuate our indifference? He then insists that the only distinction between DuBose's case and that of the two mental health technicians in AFSCME v. State of Illinois is "that the person who died in [that case] was a profoundly mentally retarded patient * * * and not a child, as was the case here." 173 Ill.2d at 339, 219 Ill.Dec. at 521, 671 N.E.2d at 688. He suggests that we view the life of a mental patient "as somehow less worthy of our concern and protection than the life of a child" and hastens to remind us that we "are duty bound to place such prejudices behind [us] when acting as justices of this court [where we] are obliged to follow the law, and under the law of Illinois, all people are equal." 173 Ill.2d at 339, 219 Ill.Dec. at 521, 671 N.E.2d at 688. These accusations are not only unfounded, but they have no place in a judicial opinion and do not deserve the dignity of a response.
Returning to the legal issues in this case, we note that although Justices Heiple and Nickels omit the rancor, they, too, view AFSCME v. State of Illinois as analogous to the case before us. However, DuBose's situation *685 is not analogous to that of the two mental health technicians. As we have explained, the arbitrator there reinstated the workers by reducing their dismissals to suspensions. We upheld the arbitral decision because the arbitrator expressly found that the employees "were exemplary mental health employees, * * * punishment ha[s] been imposed, and * * * no nexis [sic] exist[ed] between the infraction and the * * * death." AFSCME v. State of Illinois, 124 Ill.2d at 262-63, 124 Ill.Dec. 553, 529 N.E.2d 534. That holding specifically recognized the long-standing principle that an employee's amenability to discipline is a factual determination which cannot be questioned or rejected by a reviewing court. See Misco, 484 U.S. at 44-45, 108 S.Ct. at 374, 98 L.Ed.2d at 303. In other words, this court's decision then reflected the understanding that
"[o]rdinarily, a court would be hard-pressed to find a public policy barring reinstatement in a case in which an arbitrator has, expressly or by implication, determined that the employee is subject to rehabilitation and therefore not likely to commit an act which violates public policy in the future." Stead, 886 F.2d at 1213.
Of course, such an express or implied determination from the arbitrator is totally lacking in this case. And that, of course, is why AFSCME v. State of Illinois, is of little assistance in resolving the issues presented in this case.
In addition, Justice Heiple stresses that, in this case, no "nexus" exists between DuBose's conduct and the unfortunate deaths of the children. He states that our previous decisions have required a nexus between the misconduct and the harm suffered in order for the public policy exception to apply. 173 Ill.2d at 336, 219 Ill.Dec. at 520, 671 N.E.2d at 687. However, this court has never ruled that such a nexus must exist and to suggest otherwise oversimplifies the holding of AFSCME v. State of Illinois. This court's decision there did not turn solely on whether a nexus existed. The court, in fact, identified two other factors which were equally important: whether the arbitral award sanctioned violations of the law (it did not because the misconduct did not go unpunished) and whether the arbitral decision posed a threat of harm to third persons (it did not based upon the arbitrator's factual findings). See AFSCME v. State of Illinois, 124 Ill.2d at 263-65, 124 Ill.Dec. 553, 529 N.E.2d 534. Justice Heiple does not consider these two other elements and does not discuss how they would apply to the facts in this case.
The arbitral award here fails to safeguard DCFS, the courts, and the public from any possible future falsifications and neglect on DuBose's part. This shortcoming, in the eyes of the dissenting justices, is insufficient to warrant the invocation of the public policy exception. Instead, the dissenting justices are confident that the next children who would come under DuBose's supervision would receive from her all that the legislature demands. They apparently trust that the next uniform progress report prepared by DuBose for use at a placement hearing in the circuit court would be accurate. We, however, cannot take the risk which attends to such confidence. In this respect, Justices Nickels and Harrison suggest that we are improperly speculating or assuming that DuBose will be derelict in the future. Nothing is further from the truth. We are merely mindful that DuBose's past performance has called into question her dedication to and her ability to perform a job which impacts on the safety and welfare of others. As we have stated, when public policy is at issue, it is the court's responsibility to protect the public interest at stake. That is why courts will not give the drunken pilot the opportunity to fly a commercial airliner again even though no harm befell his passengers. Likewise, courts will step in to insure that the hungry nuclear power plant employee will not contaminate an entire population the next time he is in a hurry to eat lunch.
Justice Nickels states that we have removed an "important bargained-for due process consideration from the collective-bargaining agreement" (173 Ill.2d at 347, 219 Ill.Dec. at 525, 671 N.E.2d at 692), and Justice Harrison denounces us for reducing industrial due process to a "sham" (173 Ill.2d at 342, 219 Ill.Dec. at 522, 671 N.E.2d at 689). In fact, Justice Harrison's polemic leaves one with the misimpression that our *686 decision sounds the death knell for organized labor in this state because an employer can now take away an employee's job without ever having to substantiate its charges of misconduct. None of these points are very well-taken and, in fact, fall wide of the mark.
First, our opinion in no way enables DCFS to take away DuBose's job without substantiating its allegations. Justice Harrison forgets that it was AFSCME, by its own procedural posturing, that insured that result by filing its ill-advised "demurrer" after the circuit court specifically ordered the case to be heard on its merits. At that time, AFSCME elected not to offer a defense to the charges. Therefore, as the arbitrator before us did at the conclusion of the second hearing, we, too, must conclude that just cause did, in fact, exist for DuBose's dismissal. See Ramonas v. Kerelis, 102 Ill.App.2d 262, 243 N.E.2d 711 (1968) (holding that a party's default at arbitration hearing results in a complete, final, and binding determination of the controversy). Once AFSCME removed the issue of just cause from its grievance, DCFS's charges became "substantiated." Our opinion today did not compel that result nor should the blame for it rest upon our shoulders.
Second, our opinion in no way holds that the timeliness provision in the collective-bargaining agreement can never be invoked. Rather, our opinion merely recognizes the fact that in certain cases, a mechanical application of the provision may, as it did here, collide with public policy. Indeed, DCFS employees who occupy sensitive positions concerning the safety and welfare of the people DCFS is legislatively designed to protect are more susceptible to a public policy challenge than those workers who do not. Simply stated, a DCFS child welfare specialist is not in the same league as a DCFS janitor. The public policy concerns implicated in the case of the former are notably absent in the case of the latter. Our opinion acknowledges this reality. Moreover, our recognition of the possibility of other remedies, short of a blanket reinstatement, belies any intimation on the part of the dissent that we have ignored the language of the collective-bargaining agreement at issue. We note that it is in this context that Justice Harrison accuses us of "union busting." 173 Ill.2d at 342, 219 Ill.Dec. at 522, 671 N.E.2d at 689. Like his other accusation regarding our impartiality, this charge, too, lacks merit, is without any basis or support, and does not deserve the dignity of a response.
The dissenting justices would have the highest court of this state play the part of an ostrich by putting its head in the sand and pretending that the potential for tragedy does not exist or, even worse, by waiting until some tragedy actually befalls a child. Although our concern for the children and families served by DCFS is cause enough for us to invoke public policy, we feel compelled to offer some observations, which, in our opinion, would seem superfluous but for the opprobrium utilized by some of our dissenting brethren. The ramifications of permitting the type of reinstatement ordered here would undoubtedly be felt by more than just the children and families served by DCFS. The resulting perception of a tolerance of dishonesty and neglect in DCFS workers would undermine the public's confidence in the system as a whole and would do little to enhance the public image of our unions and their workers. More important, such a reinstatement would leave our circuit judges in the unenviable position of having to "second-guess" the reports submitted by DuBose and her peers, reports which, as we have pointed out, are essential in carrying out the legislature's mandate regarding abused and neglected children. Their jobs, already arduous because of the nature of these proceedings, would be made even more onerous. We will not put our imprimatur on such a disaster. We do not believe that deference to arbitration, a concept with which we wholeheartedly agree, suffers at all if the judiciary retains the right to keep arbitrators within the bounds of public policy. Nor do we believe that the United States Supreme Court's decision in Misco compels the "hands-off" approach espoused in the dissents.

CONCLUSION
The initial arbitral award in this case violates public policy. Therefore, the judgment *687 of the appellate court is reversed, and the order of the circuit court, which confirmed the supplemental arbitral award, is affirmed.
Appellate court judgment reversed; circuit court judgment affirmed.
Justice HEIPLE, dissenting:
Courts are duty bound to enforce labor-arbitration awards premised upon the parties' collective-bargaining agreements absent fraud, corruption, partiality, misconduct, mistake or failure to submit the question to arbitration. Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600, 74 Ill.2d 412, 421, 24 Ill.Dec. 843, 386 N.E.2d 47 (1979). As the majority correctly opines, an exception to this rule exists where enforcement of a contract is repugnant to the public policy favoring the welfare, safety and protection of minors. 173 Ill.2d at 316, 219 Ill.Dec. at 510, 671 N.E.2d at 677. However, the mere identification of a relevant public policy is insufficient to warrant circumventing a collective-bargaining agreement. Rather, our decisions have held that for such public policy exceptions to apply, there must be a nexus between the misconduct of the employee and the harm suffered. See, e.g., American Federation of State, County & Municipal Employees v. State of Illinois, 124 Ill.2d 246, 260-65, 124 Ill.Dec. 553, 529 N.E.2d 534 (1988) (holding that reinstatement of mental health workers did not violate public policy favoring the competent care of the mentally disabled where, inter alia, no nexus existed between the mistreatment and the patient's death). In the instant case it is uncontroverted that the DCFS worker's failure to fulfill her duties was wholly unrelated to the unfortunate deaths of the children at issue. Accordingly, the application of a public policy exception to circumvent the collective-bargaining agreement constitutes an unwarranted application of the public policy exception and I respectfully dissent.
Justice HARRISON, also dissenting:
My colleagues have persuaded themselves that they have struck "the proper balance between the public's interest in protecting its children, the utilization of arbitration as a means for settling labor disputes, and the proper role of the judiciary in the arbitral process." In fact, their decision does nothing to aid children, ignores the basic protections guaranteed to state employees by the Illinois Public Labor Relations Act (5 ILCS 315/1 et seq. (West 1992)), and converts the courts into agents for subverting industrial due process.
To cynics familiar with this court's recent decisions in Barnett v. Zion Park District, 171 Ill.2d 378, 216 Ill.Dec. 550, 665 N.E.2d 808 (1996), and Mt. Zion State Bank & Trust v. Consolidated Communications, Inc., 169 Ill.2d 110, 214 Ill.Dec. 156, 660 N.E.2d 863 (1995), the majority's professed concern for the welfare of children may seem more than a little disingenuous. In both of those cases, the court had an opportunity to provide meaningful redress where children were actually injured or killed due to the negligence of others. Instead, when compassion would have made a real difference, it was nowhere to be found. The court refused to help.
Here, by contrast, the court's compassion appears boundless, but it has waited to debut until a time when it is of no immediate benefit to anyone but a governmental bureaucracy that is unhappy with the obligations imposed by the Illinois Public Labor Relations Act and by the terms of the collective-bargaining agreement it negotiated with its employees' union.
I have certainly not forgotten, I could not forget, that dead children figure into this case. But their deaths are wholly unrelated to anything Vera DuBose may have done wrong in her capacity as a DCFS child welfare specialist. The charges against her have never been addressed on the merits, but even if DuBose did falsify a case report and even if she did fail to prepare all of the service plans she should have, those transgressions were wholly unrelated to what happened to the children. The children perished because their house burned down, not because their case worker failed to do her job properly.
The situation here is analogous to the one we considered in American Federation of State, County & Municipal Employees v. *688 State of Illinois, 124 Ill.2d 246, 124 Ill.Dec. 553, 529 N.E.2d 534 (1988), where a patient at a mental health facility died while two employees of the facility were away from their work site without permission. The Department of Mental Health discharged the employees, but the arbitrator reduced the discipline to suspensions and reinstatement without back pay or other benefits. The circuit court subsequently vacated the arbitration award on the grounds that "it represented a severe and extreme departure from the public policy of Illinois, which is to protect not to endanger mental patients." American Federation of State, County & Municipal Employees, 124 Ill.2d at 252, 124 Ill.Dec. 553, 529 N.E.2d 534. The appellate court reversed, and this court affirmed the appellate court's judgment, remanding the cause with directions to order enforcement of the arbitrator's award. In so doing, this court specifically rejected the circuit court's reasoning and held that public policy did not mandate discharge where, as here, there was no nexus between the employees' infraction and the patient's death.
While the misconduct Dubose allegedly committed may be reprehensible, it is certainly no worse than the conduct of the mental health workers this court allowed to be reinstated in American Federation of State, County & Municipal Employees. More importantly, reinstatement of DuBose poses no more threat of harm or danger to third persons than did reinstatement of the mental health workers in that case. To the contrary, reinstatement of DuBose presents a far lower risk, for her job is simply to monitor and make reports about the care provided by others. In contrast to the employees disciplined in American Federation of State, County & Municipal Employees, she has no direct responsibility for client care herself.
If reinstatement did not offend public policy in American Federation of State, County & Municipal Employees, it surely does not do so in this case either. The only thing that distinguishes the cases is that the person who died in American Federation of State, County & Municipal Employees was a profoundly mentally retarded patient tied to a toilet by state workers and not a child, as was the case here. That distinction, however, should be of no consequence to my colleagues. They may believe that the life of a helpless state mental patient is somehow less worthy of our concern and protection than the life of a child, but they are duty bound to place such prejudices behind them when acting as justices of this court. Here they are obliged to follow the law, and under the law of Illinois, all people are equal.
In making these remarks, I do not mean to suggest that sloth or dishonesty by public employees is ever acceptable. The people of this state are entitled to expect public workers to be conscientious and diligent, and when workers do not fulfill their obligations, the State must have the power to terminate or discipline them. The State had that power here. The problem is that the power was not exercised properly.
If DCFS really believed that continued employment of Vera DuBose posed the terrible threat depicted by my colleagues, it could have taken remedial action promptly, as the collective-bargaining agreement and the Illinois Public Labor Relations Act required. It failed to do so. Instead, it inexplicably allowed seven months to pass before it initiated predisciplinary measures. Where, I wonder, was the agency's concern for Vera DuBose's clients during all that time?
Considering the lengthy delay before DCFS finally took action, it seems apparent that the agency was not, in fact, worried that her work might actually endanger any children. Instead, the notion of protecting minors appears to be nothing more than an expedient the agency has employed to circumvent its statutory and contractual obligations to its employees. Contrary to my colleagues, I do not believe we should aid DCFS in this effort.
Whatever DuBose allegedly did or failed to do, she did not break the law. Her only offense, if she committed one, was failure to perform the requirements of her job. This is not an insignificant matter, especially where the protection and welfare of minors may be involved, but it is no reason to negate the provisions of the collective-bargaining agreement. Most public employees provide important services that affect public health and *689 safety one way or another, and by the logic employed by my colleagues, public policy would be violated and the terms of the collective-bargaining agreements could be ignored anytime such an employee failed to perform his job properly. If that were the case, the protection afforded public employees by collective-bargaining agreements would be rendered meaningless.
In his dissent from the appellate court's opinion, Justice Steigmann acknowledged that the circuit court's ruling could not be affirmed without disregarding the express terms of the collective-bargaining agreement, but he dismissed this problem with a cavalier "So what?" I winced when I read this, and I think anyone who understands organized labor and the law of Illinois will have the same response. Collective-bargaining agreements are the cornerstone of our labor policy. Without them, the benefits of union representation would be impossible. Organized labor would collapse.
Justice Steigmann and the majority on this court may believe that life without unions would be a good thing, but they are wrong. Unions help improve working conditions, wages, and job security, and provide employees with a voice in workplace matters that they would otherwise lack. At the same time, they tend to increase the employer's productivity by reducing employee turnover and fostering more rational management policies.
While critics of the labor movement may take issue with some of these claims, the matter is not for us to judge. Any debate as to the advantages of allowing public employees to organize and bargain collectively was settled by the General Assembly when it enacted the Illinois Public Labor Relations Act. That statute specifically declares that it is the public policy of this state to grant public employees the right to organize for the purpose of negotiating wages, hours, and other conditions of employment. 5 ILCS 315/2 (West 1994). To effectuate this policy, the statute provides that public employees have the right and public employers have the duty to bargain collectively (5 ILCS 315/6, 315/7 (West 1994)) and that, with certain exceptions not relevant here,
"any collective bargaining contract * * * executed pursuant to th[e] Act shall supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents" (5 ILCS 315/15(b) (West 1994)).
In holding that the collective-bargaining agreement at issue here must yield to "public policy," the majority fails to see that the foregoing statutory provisions evince a second and separate "public policy" requiring that the collective-bargaining agreement be enforced as written. Considering the critical importance of collective bargaining, on the one hand, and the absence of any demonstrable harm or threat of harm to any actual children, on the other, it is this second "public policy" which should take precedence under the particular facts of this case.
The majority's decision today enables DCFS to take Vera DuBose's job away from her without ever having to substantiate its allegations and without even having to follow the procedural requirements specified by the collective-bargaining agreement. To claim that this somehow satisfies industrial due process reduces the concept to a sham. When all is said and done, this opinion amounts to nothing more than an attempt to exploit the specter of helpless children as a means to rationalize judicial union busting. This effort is totally misguided. If my colleagues are truly concerned with protecting young children, they should stand in defense of collective bargaining and uphold the requirements of the Illinois Public Labor Relations Act so that DCFS workers can obtain the resources they need to keep up with their crushing caseloads and perform their jobs properly.
For the foregoing reasons, I would affirm the judgment of the appellate court upholding the arbitrator's award in favor of DuBose. I therefore dissent.
Justice NICKELS, also dissenting:
Public policy "is a very unruly horse, and * * * once you get astride it you never know where it will carry you." Richard v. Mellish, *690 2 Bing. 229, 252, 130 Eng.Rep. 294, 303 (1824). In its decision today, the majority grabs the reigns of that unruly horse and embarks on a journey that will serve only to frustrate the goals of collective bargaining and sacrifice the efficiency of binding arbitration as a means of resolving labor disputes. I cannot join the majority on this journey. Therefore, I respectfully dissent.
The majority recognizes that the review of an arbitral award is very limited. Indeed, a court must construe an award as valid if at all possible. Board of Education v. Chicago Teachers Union, Local No. 1, 86 Ill.2d 469, 477, 56 Ill.Dec. 653, 427 N.E.2d 1199 (1981). Such a deferential judicial review is necessary to promote the efficient private settlement of labor disputes. A reviewing court is therefore duty bound to follow the decision of an arbitrator that draws its essence from a collective-bargaining agreement, regardless of its view of the wrongfulness of the conduct at issue or the appropriateness of the punishment. Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600, 74 Ill.2d 412, 421, 24 Ill.Dec. 843, 386 N.E.2d 47 (1979).
I recognize that a court will not enforce an arbitral award made pursuant to a collective-bargaining agreement where that award violates public policy. American Federation of State, County & Municipal Employees v. State of Illinois, 124 Ill.2d 246, 260, 124 Ill.Dec. 553, 529 N.E.2d 534 (1988). The doctrine is based on the common law notion that courts will not lend judicial power to the enforcement of private agreements that are immoral or illegal. United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 44, 108 S.Ct. 364, 374, 98 L.Ed.2d 286, 302 (1987). However, the public policy exception is an extremely narrow one and should "not otherwise sanction a broad judicial power to set aside arbitration awards." Misco, 484 U.S. at 43, 108 S.Ct. at 373, 98 L.Ed.2d at 302.
In the past, this court has followed the United States Supreme Court in carefully limiting the public policy exception to the enforcement of arbitral awards. In order to overturn an award, the public policy involved "must be well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298, 307 (1983), quoting Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744, 756 (1945). Although leaving open the question of whether an award must actually violate positive law to violate public policy, the Supreme Court has noted that the decision to overturn an arbitral award on public policy grounds should turn on "whether the award created any explicit conflict with other `laws and legal precedents.'" Misco, 484 U.S. at 43, 108 S.Ct. at 374, 98 L.Ed.2d at 302, quoting W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298, 307, (1983).
Applying these principles, this court has refused to overturn an arbitral award in a case with strong similarities to the present case. In American Federation of State, County & Municipal Employees v. State of Illinois, 124 Ill.2d 246, 124 Ill.Dec. 553, 529 N.E.2d 534 (1988), this court considered whether an arbitrator violated public policy in awarding the reinstatement of two mental health technicians. The technicians had made an unauthorized trip to a flea market during their shift. During their absence, an unattended patient at the facility died, although the patient was not assigned to the ward where the technicians were supposed to be on duty. The technicians were discharged for conduct constituting mistreatment of a service recipient and the union filed a grievance. The arbitrator reinstated the technicians, finding that the absence did not constitute just cause for termination.
On review, this court refused to vacate the arbitral award of reinstatement on public policy grounds. This court acknowledged that the compassionate care of the mentally disabled is an important public policy. American Federation of State, County & Municipal Employees, 124 Ill.2d at 262, 124 Ill.Dec. 553, 529 N.E.2d 534. However, the arbitral award reinstating the technicians did not conflict with any laws or legal precedent relating to this public interest. The court *691 stated that "[t]here is simply no policy that mandates the discharge of all employees found guilty of mistreatment of a service recipient." American Federation of State, County & Municipal Employees, 124 Ill.2d at 263, 124 Ill.Dec. 553, 529 N.E.2d 534.
I believe that this case calls for the same judicial restraint. I recognize that there exists a general public policy favoring the diligent protection of minors, similar to the general public policy favoring the protection of the mentally disabled. However, there exists no policy that mandates the discharge of every DCFS employee that files a false report, regardless of the circumstances. The majority does not identify a "well defined and dominant" public policy that is in explicit conflict with the reinstatement of DuBose.
In an effort to obscure this point, the majority first manufactures a public policy that can hardly be considered well defined. After reviewing the statutory framework set up for the protection of minors, the majority declares that it violates public policy for DCFS to employ "individuals whose dishonesty and neglect could seriously undermine the welfare, safety, and protection of minors." 173 Ill.2d at 316, 219 Ill.Dec. at 511, 671 N.E.2d at 678. How dishonest? How neglectful? Presumably, any employee's misconduct can be framed in these generic terms. With such a broad articulation of public policy, courts are now free to substitute their judgment for that of the arbitrator regarding the discipline of DCFS employees under the guise of public policy. In addition, such a broad articulation of public policy completely usurps an arbitrator's power to determine whether any such misconduct constitutes "just cause" for termination. In this opinion, the limited public policy exception to the enforcement of arbitration awards has evolved into a basis for the judicial review of all DCFS employment decisions.
Even if I were to accept the existence of such a nebulous public policy as a basis to overturn an award, the reinstatement of DuBose does not necessarily violate such a policy. The statutory scheme put in place for the protection of minors does not evince a public policy that would demand the firing of every individual found to be dishonest or neglectful in regard to his or her statutory duties. The majority tacitly acknowledges this fact in stating that this court would be obligated to affirm the reinstatement if the arbitrator were to make a rational finding that the employee can be trusted to refrain from the misconduct in the future. 173 Ill.2d at 322, 219 Ill.Dec. at 513, 671 N.E.2d at 680. Even without such a finding, there is simply no explicit conflict with these laws or any legal precedent posed by the reinstatement of a DCFS worker who has filed a false report.
In its effort to find a violation of the public policy it has identified, the majority also invades the exclusive province of the arbitrator by engaging in inappropriate fact finding. In United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), the Supreme Court chastised the lower court for drawing an inference that because an employee was discovered in another employee's car with a lit marijuana cigarette and had drugs in his own car in the company parking lot, he was using drugs at work. The Supreme Court noted that such fact finding is the exclusive province of the arbitrator chosen by the parties and the "refusal to enforce an award must rest on more than speculation or assumption." Misco, 484 U.S. at 44, 108 S.Ct. at 374, 98 L.Ed.2d at 303. In the instant case, the majority speculates that DuBose put children in danger by filing the false reports and assumes that such conduct will continue if she is reinstated. The arbitrator did not find these facts and the majority is in error to assume them.
Moreover, I cannot accept the majority's conclusion that the arbitrator violated public policy in the process of enforcing the contractual provision requiring discipline be timely. The supposed public policy identified by the majority requiring DCFS employ only the most diligent and truthful people is not "dominant" in relation to the general public policy favoring the timely imposition of discipline. Timeliness is required for the imposition of almost all civil and criminal liability, including that involving children. The majority provides no meaningful basis for its distinction between the timeliness provisions *692 at issue here and those imposed by the legislature. Such provisions impose a burden upon those seeking sanctions to respect the rights of the individual, and all impose corresponding costs on society. In refusing to enforce the provision requiring discipline be timely, the majority has removed an important bargained-for due process consideration from the collective-bargaining agreement.
Even accepting the majority's conclusion that the award of reinstatement violated public policy, the proper resolution of the matter is to return this case to the arbitrator for an alternate remedy. The formulation of remedies is a matter for the arbitrator, not the courts. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960). There is no dispute that DCFS violated the collective-bargaining agreement in failing to impose timely discipline. The majority's conclusion that the arbitrator adopted an "all or nothing approach" that rejected any other remedy for the contractual violation is simply absurd. In leaving the violation of the timeliness provision without a remedy, the majority invites DCFS to ignore it in the future.
In conclusion, I question how an arbitrator in the next case can avoid the folly that this case has become. When faced with a disciplinary action not timely taken, an arbitrator may no longer find that the action is untimely and enforce the collective-bargaining agreement as written. The arbitrator must now take proof on the merits in order to determine if the misconduct actually occurred, and if it did, then determine if it is gross enough to negate the operation of the limitations provision. Whatever the arbitrator's decision, it is certain to spawn an appeal thereby sacrificing the efficiency of "binding" arbitration as a means of resolving labor disputes. This is the legacy of the majority's ride on that unruly horse.
HEIPLE, J., joins in this dissent.