ROBERT J. HATHAWAY, Adm'r of the Estate of Rody Ray Hathaway, Deceased, *et al.*, Plaintiffs-Appellants, v. STANDARD MUTUAL INSURANCE COMPANY *et al.*, Defendants-Appellees (Jason M. Barton, Plaintiff; Blake E. Vaughn *et al.*, Defendants).

Fifth District  No. 5—95—0255

Opinion filed November 22, 1996.

KUEHN and GOLDENHERSH, JJ., specially concurring.

Jon E. Rosenstengel, of Bonifield & Rosenstengel, of Belleville, Edward J. Kionka, of Carbondale, and M. Keith Smith, of Mt. Vernon, for appellants.

Michal Doerge, of Jelliffe, Ferrell & Morris, of Harrisburg, for appellee Standard Mutual Insurance Company.

Robert Michael Drone, of Conger & Elliott, P.C., of Carmi, for appellee Country Companies Insurance Company.

JUSTICE CHAPMAN delivered the opinion of the court:

Several times in recent years this court has ruled on the recoverability of underinsured motorist benefits when multiple claimants exhaust the coverage of the underinsured vehicle. See *Golladay v. Allied American Insurance Co.*, 271 Ill. App. 3d 465, 648 N.E.2d 157 (1st Dist. 1995); *Illinois Farmers Insurance Co. v. Tabor*, 267 Ill. App. 3d 245, 642 N.E.2d 159 (2d Dist. 1994); *Moriconi v. Sentry Insurance of Illinois, Inc.*, 193 Ill. App. 3d 904, 550 N.E.2d 637 (4th Dist. 1990); *Purlee v. Liberty Mutual Fire Insurance Co.*, 260 Ill. App. 3d 11, 631 N.E.2d 433 (5th Dist. 1994); *Cummins v. Country Mutual Insurance Co.*, 281 Ill. App. 3d 5, 666 N.E.2d 909 (5th Dist. 1996), *appeal allowed*, 168 Ill. 2d 586 (1996). The rulings have been mixed, not only among the districts, but also within the same district. See *Purlee v. Liberty Mutual Fire Insurance Co.*, 260 Ill. App. 3d 11, 631 N.E.2d 433 (5th Dist. 1994); *Cummins v. Country Mutual Insurance Co.*, 281 Ill. App. 3d 5, 666 N.E.2d 909 (5th Dist. 1996). We conclude that beneficiaries of underinsured motorist coverage whose injuries are not fully compensated for by the coverage on the underinsured vehicle are entitled to recover under their underinsured motorist coverage even though the bodily injury liability limits of the underinsured vehicle are equal to or greater than the underinsured motorist limits.

Before we begin the analysis of this problem, a brief general history of underinsured motorist coverage is in order. Historically, underinsured coverage is a complement to uninsured coverage. What is uninsured coverage? Uninsured coverage is insurance that provides limited benefits to responsible insureds who are injured in accidents with people who do not carry liability insurance. Uninsured coverage enables prudent drivers, who are willing to pay the appropriate premium, to protect themselves against the likelihood that they will be involved in an accident with a person who has no insurance. Uninsured motorist coverage became generally available in Illinois in approximately 1963, and it obviously filled a perceived void in insurance coverage. The uninsured motorist coverage in essence said:

"For an appropriate premium, if you are injured in an auto ac-

cident, you will be compensated for your injuries up to $XXX, even though the other person has no insurance."

In 1980, only 17 years after the advent of uninsured motorist coverage, it became apparent that uninsured motorist coverage alone was not enough to protect responsible drivers who were willing to pay appropriate premiums. The gap in protection for responsible drivers occurred when the other driver in an occurrence was not completely uninsured. If, for example, the driver at fault had bodily injury liability limits of $20,000 and the injured person had uninsured motorist limits of $100,000, the injured person could recover nothing from an uninsured motorist policy. He or she would have been better off if the driver at fault had been completely uninsured instead of only underinsured. The legislative response to this problem was to provide for insurance, in fact, to require insurance companies to offer underinsured motorist coverage. Ill. Rev. Stat., 1980 Supp., ch. 73, par. 755a—1 (now see 215 ILCS 5/143a—2 (West 1994)).

The underinsured coverage was intended to offer responsible drivers a way to protect themselves not only from uninsured motorists but also from underinsured motorists. By paying the appropriate premium, responsible drivers could be assured that, if they were injured in an auto accident, they would be able to recover up to the limits they purchased from their own insurance companies, regardless of the insurance status of the driver at fault. The driver at fault could be completely without insurance, in which case responsible drivers could recover the entire amount of their uninsured motorist coverage limits, assuming, of course, that their injuries were severe enough to entitle them to the full amount. If, on the other hand, the driver at fault had insurance, and the responsible drivers' injuries were severe enough, they would be able to recover the entire amount of their underinsured limits, less the amount recovered from the driver at fault. In both situations, the responsible driver was protected up to the limits of the coverage, whether uninsured motorist coverage or underinsured motorist coverage. In both situations, the insurance companies' maximum exposure was limited to the amount of the coverage selected by their insureds, and in the case of underinsured coverage, that exposure would be reduced by the amount their insureds received from the underinsured driver. The insurance companies' exposure was also limited by the limits they imposed of so much per person, so much per occurrence. At this point everything seems covered. Insureds can purchase the appropriate protection, and insurance companies will pay the appropriate amounts.

What happened next? There was an accident in which several in-

sureds were injured. If the driver at fault had been uninsured, each of the injured insureds would have been able to recover up to the uninsured limits, assuming that their injuries were that serious. What if the driver at fault was underinsured, that is, what if the limits of the driver at fault were not enough to compensate all the insureds for the full extent of their injuries? Well, most people would say, "Since underinsured motorist insurance was extended to fill the gap created by underinsured versus uninsured motorist coverage, obviously the insureds are entitled to recover up to the limits of their underinsured coverage, less whatever amounts they can recover from the underinsured driver."

Most, if not all, people might see it that way, but the courts have not. Beginning with *Moriconi v. Sentry Insurance of Illinois, Inc.*, 193 Ill. App. 3d 904, 550 N.E.2d 637 (1990), and extending through *Golladay v. Allied American Insurance Co.*, 271 Ill. App. 3d 465, 648 N.E.2d 157 (1995), most courts have applied the definition of underinsured vehicle found in the first sentence of section 143a—2(4) of the Illinois Insurance Code (215 ILCS 5/143a—2(4) (West 1994)) to deprive insureds of the protection they had purchased. See also *Purlee v. Liberty Mutual Fire Insurance Co.*, 260 Ill. App. 3d 11, 631 N.E.2d 433 (1994); *Illinois Farmers Insurance Co. v. Tabor*, 267 Ill. App. 3d 245, 642 N.E.2d 159 (1994). But see *Cummins v. Country Mutual Insurance Co.*, 281 Ill. App. 3d 5, 666 N.E.2d 909 (1996).

We conclude that *Moriconi* and the other cases relying solely on the first sentence of section 143a—2(4) have misconstrued the statute as applied to the multiple-claimant anomaly.

■ Section 143a—2 of the Illinois Insurance Code that was in effect at the time of plaintiffs' accident read:

> "For the purpose of this Act the term *'underinsured motor vehicle' means a motor vehicle whose* ownership, maintenance or *use has resulted in bodily injury or death of the insured,* as defined in the policy, *and for which the sum of the limits of liability under all bodily injury liability insurance policies* or under bonds or other security required to be maintained under Illinois law applicable to the driver or to the person or organization legally responsible for such vehicle and applicable to the vehicle, *is less than the limits for underinsured coverage provided the insured* as defined in the policy at the time of the accident. The limits of liability for an insurer providing underinsured motorist coverage shall be the limits of such coverage, less those amounts *actually recovered* under the applicable bodily injury insurance policies, bonds or other security maintained on the underinsured motor vehicle." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 73, par. 755a—2.

■ Most of the courts that have construed the statute have

focused on the first sentence and found it unambiguous. Consequently, they have ignored the legislative history and ruled in the insurance companies' favor. Although ambiguity in a statute is one reason for a court to examine the legislative history, it is not the only reason. An examination of the legislative history is also appropriate if the examination helps to prevent an absurd result. See W. Eskridge, *Legislative History Values*, 66 Chi.-Kent L. Rev. 365 (1990).

Although most of the cases construing the underinsured motorist statute have either refused or neglected to examine its legislative history because they found no ambiguity in it or because they concluded that it would be inappropriate to look behind its words, we do not share that view for several reasons.

First, as Professor Eskridge points out, although Justice Holmes' statement, "We do not inquire what the legislature meant; we ask only what the statute means" (Holmes, Collected Legal Papers 207), is often quoted by those reluctant to examine legislative history, that was not his final word on the subject. Holmes also said:

"It is said that when the meaning of language is plain we are not to resort to [extrinsic] evidence in order to raise doubts. That is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." *Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48, 73 L. Ed. 170, 177, 49 S. Ct. 52, 54 (1928).

As Professor Eskridge concludes:

"The pragmatic lesson for my historical exegesis is that dogmatic positions on the use of legislative history are not productive in our representative democracy." W. Eskridge, *Legislative History Values*, 66 Chi.-Kent L. Rev. 365, 440 (1990).

Second, our supreme court examined the legislative history of this very statute in *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548, 591 N.E.2d 427 (1992).

Finally, it seems to us that legislative history is like a tool; its use may be appropriate in some instances and not in others. In some cases it may not be the best tool, and in others it will. In some cases it may offer only a form of crude assistance that offends some purists, but that crude assistance may be necessary. The last example brings to mind a story of two hunters in southern Illinois who had lost their way in the depths of the Shawnee National Forest. Not only had they lost their way, they had also lost their guns, their canteens, and everything but a hand axe. These two unfortunates had been stumbling through the woods for two days when they were able to catch a snapping turtle. After chopping off the turtle's head, the first hunter raised the axe to smash the shell. The second hunter, a pur-

ist, protested, "Wait, you're going to ruin that beautiful shell." "Damn the shell, man!" the first hunter replied, "I'm after the meat!"

After beginning with and progressing through Holmes, and after reviewing and referring to the modern symposium on statutory interpretations (*Symposium On Statutory Interpretation*, 66 Chi.-Kent L. Rev. 301 (1990)), and after emerging from the darkness of the depths of the forest, we turn at last to the legislative history, and what do we find?

First, in response to the courts' conclusions about the lack of ambiguity in statutes dealing with underinsured motorist coverage, we note that Mr. Bernstein, associate counsel for State Farm Insurance Companies, stated:

"Underinsured motorist coverage is not an easy concept to grasp. We doubt if many insurance people or many legislators can explain it. It is doubly difficult, therefore, for the public to understand it." J. Bernstein, March 21, 1980, A statement presented at the hearing before the Illinois Insurance Laws Study Commission regarding Public Act 81—2101, House Bill 961, 1979 New Laws, at 3.

Second, Mr. Bernstein explains how to look at underinsured motorists:

"We suggest that the proper way to look at underinsured motorists is in terms of what this new coverage is designed to do. An insured with high[-]limit uninsured motorist coverage is in a better position if injured by an uninsured motorist than if injured by an at-fault driver carrying minimum bodily injury liability limits. The purpose of underinsured motorist insurance is to put an injured insured in the same position after an accident with a financially responsible individual (but one who is carrying relatively low limits) as he or she would be with a financially responsible motorist." J. Bernstein, March 21, 1980, A statement presented at the hearing before the Illinois Insurance Laws Study Commission regarding Public Act 81—2101, House Bill 961, 1979 New Laws, at 3.

Third, Mr. Bernstein addressed a question that is very close to the question raised in this case, and he concluded:

"The liability of the insurer should, therefore, be the difference in *recoverable limits* between the insurance, bonds, and other securities available to the tort[ ]feasor to pay for the injury and the uninsured [*sic*] motorist limits carried by the insured. In other words[,] if an insured carries $100,000/300,000 uninsured [*sic*] motorist coverage, he or she knows that in the event of an accident caused by the fault of another, protection of at least $100,000/300,000 is available at all times regardless of the re-

sources of the tort[ ]feasor." (Emphasis added.) J. Bernstein, March 21, 1980, A statement presented at the hearing before the Illinois Insurance Laws Study Commission regarding Public Act 81—2101, House Bill 961, 1979 New Laws, at 2-3.

"The reason you have underinsured motorists coverage is once you agree that there ought to be high[-]limit uninsured, you or I are better off being injured by an uninsured driver than we are by an insured driver. And so we have to make up this gap so that in the event of an injury by an at-fault driver we are in the same position regardless of whether he carries any insurance or minimum limits.

*** And what we are talking about *** is the difference in recovery, the difference, if you will, *in recoverable limits* between what is available and what is purchased by our insured.

We are not talking about an excess coverage, we are talking about putting our policy[ ]holder in the same position if he is struck by an insured low-limit driver as he is by an uninsured motorist. That is the purpose of underinsured motorist coverage." (Emphasis added.) J. Bernstein, March 21, 1980, hearing before the Illinois Insurance Laws Study Commission, House Bill 961, 1979 New Laws, at 39-40.

The quoted legislative history makes it quite clear that the statute was intended to provide insureds with protection for the difference between the *recoverable limits* from the bodily injury liability policy and the underinsured motorist policy. We, therefore, conclude that the definition of underinsured motor vehicle in the first sentence of section 143a—2 should not be allowed to subvert this clear legislative purpose of placing the injured insured in the same position regardless of whether the driver of the culpable vehicle is uninsured or underinsured. The first sentence cannot be read in isolation. This situation is similar to the one described by Justice Heiple in *Hoglund v. State Farm Mutual Automobile Insurance Co.*, 148 Ill. 2d 272, 592 N.E.2d 1031 (1992):

"We believe that the exculpatory language on which State Farm relies cannot be read in isolation. Rather, it must be read in conjunction with the policyholder's reasonable expectations and it must also be read in conjunction with the public policy behind the uninsured motorist statute and the coverage intended by the insurance policy itself. Moreover, the setoff provision must be read with reference to the facts of the case at hand. When viewed in this way, a latent ambiguity in the policy language is disclosed. ***

*** Such a result would violate the public policy behind the uninsured motorist statute that the injured party be placed in the

same position as if the uninsured driver had been insured. Additionally, the insurance polices at issue were intended to provide coverage for damages caused by uninsured motorists. To allow a literal interpretation of the policy language would nullify the coverage intended by the policies. Further, to endorse State Farm's interpretation of the setoff provision would deny the policyholder substantial economic value in return for the payment of premiums. That is to say, the insured would be denied the very insurance protection against uninsured motorists for which he had paid premiums." *Hoglund,* 148 Ill. 2d at 279-80, 592 N.E.2d at 1034-35.

In summary, we reverse the trial court for two reasons. First, the statutory definitions, when considered in conjunction with their legislative history, mandate the coverage. Second, a reading of both the policies and the statute with the policyholder's reasonable expectations and the public policy behind the underinsured motorist coverage in mind requires this court to reach the same conclusion that the supreme court reached in *Hoglund.*

We agree with Justice Maag that "the law ought to make sense" and feel that his recent illustration bears repeating:

"Assume that an automobile accident occurs. Assume further that the driver of vehicle 'A' is negligent and is the cause of the accident. The driver of vehicle 'A' carries $25,000 in liability coverage. The driver of vehicle 'B' carries $25,000 in underinsured motorist coverage. Finally, assume that in vehicle 'B' there is one passenger along with the driver of vehicle 'B.' If the passenger in vehicle 'B' immediately files suit and is awarded $25,000, and if the judgment is paid in full by driver 'A' 's liability policy, then there would be no coverage left under driver 'A' 's policy to pay a judgment later rendered in favor of the driver of vehicle 'B.' The driver of vehicle 'B,' despite having paid his insurance premium dutifully, would not be entitled to recover anything under his own underinsured motorist coverage if the position of Country Mutual in the instant case was adopted." (Emphasis omitted.) *Cummins v. Country Mutual Insurance Co.,* 281 Ill. App. 3d 5, 15, 666 N.E.2d 909, 915 (1996) (Maag, J., specially concurring).

We now turn from our review of the underinsured motorist statute and its legislative history to the facts of this case.

Robert Hathaway, on behalf of Rody Hathaway, and Eric Van Zant and Jason Barton filed a five-count complaint for damages arising out of a motor vehicle accident in which Rody Hathaway was killed and Jason Barton and Eric Van Zant were injured. Only counts III and IV are the subject of this appeal. The other counts have either been settled or dismissed. As a result of settlements, the

plaintiffs received the following sums: Karen Knuist $36,523.77, Jason Barton $20,870.73, Eric Van Zant $15,653.04, Paige Borst $10,435.36, Robert Knuist $10,435.36, Lodewyk Borst $5,217.68, and the Rody Hathaway estate $5,217.69.

In count III, Van Zant sought underinsured motorist benefits from his Country Mutual insurance policy which had underinsured motorist benefits of $50,000 per person. In count IV plaintiff Hathaway sought underinsured benefits from his Standard Mutual policy which had underinsured benefits of $25,000 per person. Each of the plaintiffs claimed the difference between the underinsured motorist limits on their own policies and what they had actually received from the bodily injury/death limits of the other vehicles. The trial court granted Country Mutual's motion to dismiss count III on the pleadings and Standard Mutual's motion for summary judgment as to count IV. Robert Hathaway, on behalf of Rody Hathaway's estate, and Eric Van Zant appeal from the dismissal of counts III and IV.

The definitions of underinsured motorist vehicle contained in the Hathaway and Van Zant policies mirror the statutory language of section 143a—2. We conclude that those policy definitions, like that in the statute, cannot be used to deprive the insureds of the coverage they clearly intended to purchase.

Therefore, the judgment of the circuit court is reversed, and this case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

JUSTICE KUEHN, specially concurring:

Our opinion today differs from views taken by other members of this court. Their views flowed inexorably from a paramount rule of statutory construction that prevents a search for meaning beyond unambiguous statutory language. While I concur with Justice Chapman's opinion, I wish to underscore that the origins of our approach can be found in the words of our supreme court, first noted in *Cummins v. Country Mutual Insurance Co.*, 281 Ill. App. 3d 5, 666 N.E.2d 909 (1996). Our approach does not pioneer an uncharted course by looking beyond the language contained in the underinsured motorist statute.

In *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548, 591 N.E.2d 427 (1992), the supreme court stated:

"The court must assume that, in enacting a statute, the legislature did not intend an absurd result. [Citations.] In enacting [the underinsured motorist provision] the legislature avoided the absurdity of a situation where a policyholder would receive

fewer benefits in the fortuitous event of being injured by an underinsured rather than an uninsured motorist." *Sulser*, 147 Ill. 2d at 557, 591 N.E.2d at 430.

The court instructed consideration of legislative intent based upon the words of the House bill's sponsor, Representative Telcser, who said, " 'we wanted to be sure that *** the difference between the claim and the underinsured would be taken care of by your own insurance policy to fill the gap between the claim and the amount *available* from the underinsured ***.' " (Emphasis added.) *Sulser*, 147 Ill. 2d at 556, 591 N.E.2d at 430, quoting 81st Ill. Gen. Assem., House Proceedings, June 20, 1980, at 44-45.

Had the plaintiffs in our case been injured by an uninsured motorist, each could have recovered any amount up to the full limits of his or her own uninsured motorist coverage. Since the amount available from the underinsured motorist has been exhausted, plaintiffs are entitled to "fill the gap" between the available amount received and their own underinsured motorist coverage. To otherwise construe the underinsured motorist provision would ignore its drafters' intent in favor of one which produces absurd results.

I, therefore, specially concur.

JUSTICE GOLDENHERSH, specially concurring:

While agreeing with the result reached by Justice Chapman, I concur in the special concurrence filed by Justice Kuehn and add some comments of my own.

One should not conclude that this court has embarked on a new, uncharted route of statutory interpretation and use of legislative history. The result reached by the majority opinion is the product of substantive and statutory interpretation of precedents set forth by our supreme court.

We noted in *Cummins v. Country Mutual Insurance Co.*, 281 Ill. App. 3d 5, 666 N.E.2d 909 (1996), that an analysis in statutory interpretation must include an entire statute and not selectively concentrate on one sentence or another of a multisentence section. As Justice Kuehn notes in his special concurrence, the legislative intent of the statute in question was clearly set forth by the bill's sponsor in the House of Representatives, Representative Telcser. When faced with an ambiguity, our supreme court in *Hoglund v. State Farm Mutual Automobile Insurance Co.*, 148 Ill. 2d 272, 592 N.E.2d 1031 (1992), explained the proper method of analysis and resolution of that ambiguity. *Hoglund*, 148 Ill. 2d at 278-79, 592 N.E.2d at 1034-35. Applying this method, the *Cummins* court concluded that the statute in question was ambiguous.

The result reached by this court in the instant case also follows the lead of supreme court cases in similar circumstances. The ambiguity of the statute, the legislative history of the statute as articulated by its sponsor in the House, and the practical effect of not filling the gap between purchased insurance and actual recovery have been noted by our supreme court in *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548, 591 N.E.2d 427 (1992), and in *Hoglund*. The *Hoglund* court also indicated that the General Assembly's public policy behind the uninsured motorist statute applicable to the underinsured motorist statute as well would be frustrated if the insurance company's position, similar to defendants' position in this case, were adopted. (For the importance of public policy considerations, see *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299 (1996).) As the uninsured and underinsured motorist provisions embodied the same public policy considerations and were aimed at achieving similar results, the authorities noted above more than justify our conclusion in the instant case.

For the above-stated reasons, I specially concur in the majority opinion and concur in the special concurrence by Justice Kuehn.