SECOND DIVISION
June 6, 2006

No. 1-05-0637

NATIONAL WRECKING COMPANY,

    Plaintiff-Appellee,

    v.

SARANG CORPORATION,

    Defendant-Appellant.

Appeal from the
Circuit Court of
Cook County.

Honorable
Richard A. Siebel,
Judge Presiding.

JUSTICE SOUTH delivered the opinion of the court

This appeal arises from the circuit court's order confirming an arbitration award in favor of National Wrecking Company (National) and against Sarang Corporation (Sarang) as the result of a demand for arbitration filed by Sarang against National to determine issues relating to a joint venture formed by the parties.

The case commenced with a demand for arbitration with the American Arbitration Association filed by Sarang against National on December 1, 2003, in which Sarang stated that the nature of the dispute was "what work will be performed by the Joint Venture to comply with FAR 52.219-4 [*sic*].  What entity will perform soil remediation work."  The arbitrator held hearings and heard testimony on five occasions between June 29, 2004, and July 20, 2004, and reviewed the briefs and documents filed by counsel for the parties and heard oral arguments on September 10 and 13, 2004.

The arbitrator made the following findings of fact:  Sarang is an Illinois corporation

certified as a section 8(a) (13 CFR §124.1 *et seq.* (2002)) contractor by the United States Small Business Administration (SBA) . Bineet Sarang is the president of Sarang, Sarv Singh is an estimator employed by Sarang, and Mallik is the quality control manager employed by Sarang. National is also an Illinois corporation. Allen Mandel is the president of National, Sheldon Mandell is the chairman of the board of National, and Joe Naumes is the vice-president of National. The arbitration proceedings stemmed from the formation of a joint venture between National and Sarang to bid on a Navy demolition project at the Great Lakes Navy Training Center (Navy Project).

The Navy Project was administered through the SBA as a section 8(a) small business set-aside contract, for which Sarang was eligible to bid. The Navy Project included a base project of demolition of five buildings and an option project for the demolition of five additional buildings. The SBA has a section 8(a) program entitled the "Mentor-Protege Program," whereby larger businesses that are not considered disadvantaged can perform portions of a section 8(a) small business set-aside contract if the larger business qualifies as a mentor under the program and enters into a joint venture agreement with the small business contractor.

In late December 2002 at a meeting at National's offices, Bineet requested that a joint venture be formed to bid on the Navy Project. Mandell indicated that National would not be interested unless it could perform all of the demolition work, to which Sarang agreed. Sarang then presented National with a proposed joint venture agreement which provided for at least 15% self- performance of the cost of the contract pursuant to the requirements of Federal Acquisition Regulation (FAR) 52.219-14 (48 CFR §52.219-14 (2002)), which governs the minimum

percentage of work which the small disadvantaged business contractor must "self-perform."

The parties met again on January 3, 2003, at which time the details of the work to be performed on the Navy Project were discussed. Mandell described the work that National would perform on the job as part of its demolition subcontract based on the bid documents at that time, which included the demolition of buildings above and below grade; the removal of and disposal of medical waste from Building 1400; the backfilling of areas where the foundations were removed; and rough grading of the site. Sarang was to obtain bids for all work other than that to be performed by National.

On January 16, 2003, Sarang and National entered into a joint venture agreement (Agreement) effective January 1, 2003. The Agreement provided that the joint venture will perform at least 15% of the cost of the contract per the requirements of FAR 52.219-14 (48 CFR §52.219-14 (2002)) and that any disputes would be settled by arbitration. Also on that date, the Navy issued a modification to the Navy contract which required the contractor to include in its lump-sum bid the cost of removal of all contaminated soils disturbed during the removal of the underground structures and utilities along with a unit price for the removal of the contaminated soils.

Approximately a week before the joint venture was to submit its first bid, National informed Sarang that it was only going to bid a unit price per ton for the removal of the contaminated soils disturbed during demolition because it was too risky for it to include the removal of contaminated soils in the lump-sum bid since the quantity of those soils was unknown. On January 31, 2003, National and Sarang entered into an agreement in which they confirmed

that if the joint venture was awarded the Navy Project, the joint venture agreed to award the demolition portion of the project to National and the asbestos abatement portion to Colfax Corporation, which was owned by some of the owners of National. Also on January 31, 2003, the joint venture submitted its first bid in the amount of $2,208,000, which included $5,000 for the removal of medical waste under Building 1400. The contaminated-soils remediation was bid at a unit price of from $75 to $80 per ton, depending upon the building being demolished. Naumes prepared National's price for the removal of contaminated soils without any assistance from Singh, Bineet or anyone else associated with Sarang. The Navy informed Sarang and National that the joint venture must submit a revised bid with, among other things, a lump-sum price that includes all costs for the removal and remediation of contaminated soils and other hazardous materials disturbed during the demolition project by March 7, 2003 (the Alternate A bid). The Navy explained what soils it considered to be covered by the term "disturbed" in a conference call with Mandell, Naumes, Singh and Bineet on February 27, 2003. After this call, Mandell informed Bineet that he had not decided whether National would provide a lump-sum price for the contaminated-soils remediation because of the financial risk because it was unable to estimate the quantity or type of contaminated soil.

Based on the Navy's Alternate A bid request, National calculated the number of tons of soil that could be disturbed during the demolition process and estimated the percentage that might be potentially contaminated soil at one-third. Sarang did not take any steps to obtain any other contractor's bid or seek a price from another contractor for this work, and the joint venture never interviewed any other party to subcontract any portion of the contaminated soil work. Singh's notes from February 27, 2003, showed that National was responsible for this part of the Alternate

A bid.

Prior to the March 7, 2003, the deadline for the Alternate A bid, National informed Sarang that its price for the contaminated soil remediation on the base bid would be $511,180 and $518,000 on the option bid. National told Sarang that it was prepared to perform that work and would take the risk that its calculations were wrong in order to win the contract. Bineet testified he did not recall that conversation; however, the arbitrator found it apparent that he approved National's undertaking to provide a price for this portion of the joint venture's Alternate A bid.

The Alternate A bid was submitted by the joint venture on March 7, 2003, and was signed by Sarang and National. The joint venture's bid included the fixed price provided by National for the abatement of the contaminated soil disturbed during the demolition process. The revised bid price was $2,796,000, which included $511,180 to cover the cost of identification, removal and disposal of any contaminated soil disturbed during demolition of the base contract buildings. The bid also included pricing for the demolition of five option buildings in the amount of $3,290,000, which included $518,000 for the cost of identification, removal and disposal of any contaminated soil disturbed during demolition.

On March 20, 2003, the Navy issued an Amendment B, requesting a third bid to provide an alternate price for the removal of disturbed contaminated soil. Again the bid was prepared without input from anyone on behalf of Sarang and submitted to the Navy on March 25, 2003. On April 16, 2003, the Navy awarded the contract to the joint venture based upon the Alternate A bid (Navy contract). Shortly after the Navy contract was awarded, Naumes prepared and sent to Bineet by facsimile a one-page chart identifying the portions of the Navy contract as bid and those portions that were the responsibility of Colfax Corporation, National and the joint venture.

The document showed that National was responsible for the contaminated-soil remediation at the price given by National as included in the Alternate A bid. To that end, National purchased an insurance policy insuring it against personal injury and property damage resulting from damage caused by contaminated soil; obtained permits to transport special waste, including contaminated soil; obtained prices from various disposal facilities and contracted with Waste Management to dispose of contaminated soil; and arranged for trucks to be available for delivery of the contaminated soil to disposal sites. National also assigned its employee, Andrew Mandell, who is specially trained, certified and licensed to handle asbestos-containing materials and hazardous waste, to identify and dispose of contaminated soil disturbed during the demolition process. Bineet testified he did not read the document, but the arbitrator found his testimony not credible on that point and concluded Bineet knew of National's understanding that it was responsible for soil remediation work as early as April 22, 2003, and never contradicted that understanding until August 2003.

Shortly after the contract was awarded, the joint venture began working at the site. National began its work in June. As the demolition progressed, none of the disturbed soil was found to be contaminated. In August 2003, after two buildings had been demolished, Bineet first told National that he did not believe the contaminated soil work was to be part of National's subcontract. On August 15, 2003, Bineet instructed Mallik to draft a subcontract for National which did not provide for the removal of contaminated soil. Naumes reviewed and marked up that subcontract to include remediation of contaminated soil and revised the price to include that work. Based upon that disagreement, the subcontract was never signed.

On September 29, 2003, without consulting National or the executive committee of the

joint venture, Bineet wrote to the Navy seeking a clarification as to the applicable self-performance requirement contained in the Navy contract. Bineet indicated he believed that because the Navy contract was a "specialty trades" contract, the requirement under FAR 52.219-14(b)(4) (48 CFR §52.219-14(b)(4) (2002)) applied, namely that 25% of the total cost of the construction work was self-performance. On October 31, 2003, the contracting officer on behalf of the Navy unilaterally amended the Navy Contract, changing the self-performance percentage from 15% to 25%.

On January 14, 2004, Naumes filed a claim with the contracting officer on behalf of the joint venture claiming the Navy had no authority to change the percentage of the contract without the consent of the joint venture, which issue remains pending before the Navy.

On January 22, 2004, National and Sarang entered into an agreement (trucking agreement) to fulfill the 15% self-performance requirement of their joint venture agreement by arranging for the joint venture to rent trucks and pay the drivers of those trucks for work performed under the Navy contract.

At the time of the arbitration hearings, the base portion of the Navy contract had been completed, and the parties were performing the option portion. Sarang had not paid National any of the money included in the bid price for removing contaminated soil that had been paid to the joint venture by the Navy.

In a 33-page written order, the arbitrator made the following conclusions which are pertinent to resolution of this appeal:

> "1.    The demolition portion of the Navy Project
>
>     subcontracted to National by the Joint Venture includes the

remediation of contaminated soils as provided in the Navy Contract.

2.  In order to comply with FAR 52.219-14, the subcontract between National  and the Joint Venture shall include a provision stating: 'In accordance with the Arbitrator's award in Case No. 51 180 02020 03, the work performed by and amount to be paid to the subcontractor shall be reduced to the extent required to comply with FAR 52.219-14 in the manner set forth in Paragraphs 4 and 5 of the Award.'

3.  The Joint Venture and National shall execute National's version of the National Subcontract, attached hereto as Exhibit A, as modified pursuant to Paragraph 2 of this Award, on the effective date of this Award.

4.  Unless or until the Navy contracting officer grants the January 16, 2004[,] claim made by Naumes on behalf of the Joint Venture or an order is entered by a court or tribunal with appropriate jurisdiction modifying the Navy's unilateral modification of October 31, 2003, the Joint Venture shall take all steps reasonably required to assure that at least 25% of the cost of the Navy Contract, not including the cost of materials, is performed by Sarang Corporation or the Joint Venture.  To accomplish this:

(a) [T]he parties shall, as they have heretofore, continue to rent trucks to the Joint Venture and place the

drivers of those trucks performing on the Navy Project on the Joint Venture payroll pursuant to the Trucking Agreement or such similar agreement as the parties may arrange.

(b)  Such other work as National was to perform under the National Subcontract shall be similarly transferred to the Joint Venture.

(c)  The amount of work transferred to the Joint Venture under subprovision (a) and (b) above shall be an amount such that the cost of such work, when combined with the cost of the work that has been performed or is expected to be performed by the Joint Venture and Sarang, shall be 25% of the cost of the work under the Navy Contract as provided in FAR 52.219-14(b)(4).

(d)  To the extent that work to be performed by National pursuant to the National Subcontract is transferred to the Joint Venture, the price for that work shall be deducted from the contract price to be paid National under the National Subcontract.

In the event and to the extent that the Navy or a court or tribunal with appropriate jurisdiction grants the January 16, 2004[,] claim or otherwise determines that the unilateral modification is not

effective, the parties shall continue to comply with the provisions of this Paragraph 4 of this Award except that the percentage set forth in Paragraph 4(c) above shall be '15%' and the applicable regulation in Paragraph 4(c) above shall be 'FAR 52.219-14(b)(3).'

5. National, on behalf of the Joint Venture, may, at National's sole expense, challenge the October 31, 2003[,] decision by the contracting officer of the Navy unilaterally modifying the Navy Contract. That challenge may include the petitioning the contracting officer or pursuing such other remedies as National may in its discretion determine. Sarang [Corporation's] participation, if any, in this dispute with the Navy shall be limited to acting on its own behalf at its own expense to the extent such participation is permitted by applicable law.

6. The Joint Venture shall:

(a) Pay $511,180 to National, representing National's price for contaminated soils remediation on the base bid of the Navy Contract.

(b) Pay to National of [sic.] that portion of National's price for contaminated soils remediation applicable to the work performed on the option buildings described in the Navy Contract.

(c) Approve timely payment to National for work

performed on each of the remaining option buildings

pursuant to the terms of the Navy Contract based on

National's price for contaminated soils remediation."

Subsequently, on December 1, 2004, National filed an application for confirmation of the arbitration award in the circuit court of Cook County. Sarang responded with its answer, in which it sought to vacate and/or modify the arbitration award. Sarang argued that (1) the arbitrator exceeded his power and authority by ruling on an issue not submitted to arbitration; (2) there was no arbitration agreement covering claims of an alleged subcontractor against the joint venture; (3) the award would result in the joint venture violating federal law; (4) the award violates public policy; (5) and the award failed to dispose of all the matters properly submitted to the arbitrator. After a hearing, the circuit court denied Sarang's application to vacate or modify the award and confirmed the November 23, 2004, arbitration award, and stated National was entitled to post-judgment interest at 9% from November 23, 2004, to the date of payment. Specifically, the court found that the arbitrator made specific findings as to the issues submitted and ruled only on the matters submitted for arbitration; that the arbitrator extensively addressed the federal regulations; that there appeared to be no contravention of public policy or gross error of law; and the arbitrator disposed of all matters properly submitted for arbitration. Sarang's subsequent motion for reconsideration was denied.

Sarang has raised three issues for our consideration: (1) whether the arbitrator exceeded his authority by failing to resolve the issue of the amount of additional work to be performed by Sarang in order to achieve compliance with SBA regulations governing minority set-aside contracts; (2) whether the circuit court erred in entering a money judgment in favor of National

for the full amount of the soil work to be performed on option buildings under its subcontract with the joint venture when the arbitration award reduces the subcontract price to comply with SBA regulations; and (3) whether the arbitration award violated public policy by enforcing a demolition subcontract that contradicted the provisions of the joint venture agreement and SBA regulations requiring the minority contractor to perform a specified percentage of the work. Sarang requests the arbitration award be vacated or, alternatively, the portion of the money judgment allocated to soil work for the option buildings be vacated.

"It is important to note from the outset that the scope of judicial review of an arbitration award is nothing like the scope of an appellate court's review of a trial court's decision." Colmar, Ltd. v. Fremantelmedia North America, Inc., 344 Ill. App. 3d 977, 992 (2003). "There is a presumption that an arbitrator did not exceed his authority [citation], and if the arbitrators have acted in good faith, the award is conclusive upon the parties [citation]." Colmar, 344 Ill. App. 3d at 992. "Such deference is accorded because the parties have chosen in their contract how their dispute is to be decided, and judicial modification of an arbitrator's decision deprives the parties of that choice." Colmar, 344 Ill. App. 3d at 992. "Thus, whenever possible, a court must construe an award so as to uphold its validity." Edward Electric Co. v. Automation, Inc., 229 Ill. App. 3d 89, 97 (1992).

"In determining whether grounds exist to vacate an arbitration award, judicial review generally extends only to those areas expressly stated by statute. Edward Electric, 229 Ill. App. 3d at 97. Section 12(a) of the Illinois Uniform Arbitration Act (Act) (710 ILCS 5/1 et seq. (West 2002)) provides:

"(a) Upon application of a party, the court shall vacate an

award where:

>(1) The award was procured by corruption, fraud or other undue means;

>(2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any one of the arbitrators or misconduct prejudicing the rights of any party;

>(3) The arbitrators exceeded their powers;

>(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of Section 5, as to prejudice substantially the rights of a party[.]" 710 ILCS 5/12(a)(1) through (a)(4) (West 2002).

"Case law has established that in addition to the grounds stated above, an arbitration award may be vacated if it results in the contravention of a paramount consideration of public policy [citation], where a gross error of law or fact appears on the face of the award [citation], or where the award fails to dispose of all matters properly submitted to the arbitrators." Edward Electric, 229 Ill. App. 3d at 97-98.

Sarang first contends that the arbitration award should be vacated because the arbitrator exceeded his authority by failing to resolve all issues submitted to him. Case law provides that an arbitration award may be vacated where it does not dispose of all matters properly submitted to the arbitrators for their consideration and ruling. Harris v. Allied American Insurance Co., 152

Ill. App. 3d 88, 89 (1987). Sarang argues the award requires that the parties must agree to any additional work to be performed by it which will comply with SBA regulations. It contends that the award is not sufficiently specific to resolve the parties' divergent positions without another intervention by an impartial arbiter.

Sarang's demand for arbitration indicates that the nature of the dispute was "what work will be performed by the joint venture to comply with FAR 52.219-4 [*sic*]. What entity will perform soil remediation work." After review of the written arbitration award, we find, contrary to Sarang's assertions, the award specifically addressed all issues that were submitted to the arbitrator.

In addressing the issue of the work to be performed by the joint venture in order to comply with FAR 52.219-14 (48 CFR §52.219-14 (2002)), the arbitrator noted that the Navy contract is a section 8(a) small business set-aside contract, which requires the subcontracting on such contracts be limited to a specific percentage. According to FAR 52.219-14, under subprovision (b)(3), the small business "concern" must perform at least 15% of the cost of the contract, not including the cost of materials, with its own employees. 48 CFR §52.219-14(b)(3) (2002). Subprovision (b)(4) is identical, except it requires the concern to perform at least 25% of the cost of the contract. 48 CFR §52.219-14(b)(4) (2002). Here, the "concern" is either Sarang or the Joint Venture. At the hearing, Robert L. Conner, the assistant director for minority enterprise development of the SBA, explained that the "self-perform" requirement is satisfied if either Sarang or the joint venture performs the work, and that the "cost of the contract" did not include profit or the cost of materials. The arbitrator found the joint venture could achieve the required percentage (which was then 25% unless and until the Navy and the SBA changed it back to 15% as contained in the

original contract) by modifying the National subcontract between National and the joint venture in order to permit the joint venture to self-perform enough work to cover at least 25% of the costs of the Navy contract. The arbitrator further stated that "this should be done in the manner of the Trucking Agreement by National leasing to the Joint Venture all the equipment National is using on the Navy Project and transferring to the Joint Venture payroll all of the National employees who are working on the Navy Project and reducing the contract price to National by the cost of performing such work." Thus, contrary to Sarang's contention, the arbitration award was very specific as to how compliance with the SBA regulations was to be achieved. Furthermore, the arbitrator specifically found National was the entity to perform the soil remediation work, as it had always been the parties' intention that National would perform such work, and that Sarang had no knowledge or experience in soil remediation work. The arbitrator also found that neither Sarang nor the joint venture had taken any steps to procure other bids for the soil remediation work or investigated any other subcontractor for the work. We conclude, therefore, that Sarang's argument lacks merit, and the arbitrator properly resolved all issues submitted to him for resolution.

Next, Sarang contends the circuit court erred by entering a money judgment in favor of National for the full amount of the soil work to be performed on option buildings under its subcontract with the joint venture when the arbitration award reduces the subcontract price to comply with SBA regulations.

This argument amounts to a challenge to the circuit court's decision to affirm the arbitrator's award, which we review for as an abuse of discretion. Colmar, 344 Ill. App. 3d at 983.

˘15˘

Sarang's argument is apparently based upon the conclusion that the funds for the soil remediation work were to be included in the reduction from the subcontract price per the arbitration award. A careful review of the arbitration award reveals, however, this is not the case. As previously stated, the arbitrator found the soil remediation work was to be performed solely by National and not the joint venture. The arbitrator also crafted the remedy for allowing the joint venture to meet the minimum self-performance requirement in order to comply with SBA regulations by modifying the trucking agreement and reducing the subcontract price to National accordingly. As such, amounts for the soil remediation work were not included in that remedy, and the arbitrator never stated those amounts should not be paid to National in full. In fact, the arbitration award states:

> ""The Joint Venture shall
>
> 1 Pay 511,180 to National, representing National's price for contaminated soils remediation on the base bid of the Navy Contract.
>
> 2 Pay to National of sic that portion of National's price for contaminated soils remediation applicable to the work performed on the option buildings described in the Navy Contract.
>
> 3 Approve timely payment to National for work performed on each of the remaining option buildings pursuant to the terms of the Navy Contract based on National's price for contaminated soils remediation."

At the time the arbitration award was entered, all of the base work (five buildings) under the Navy contract had been performed, and the parties were then performing the option work (five buildings). National's bid for the option soil remediation work was $518,00, and when the

arbitration award was entered, work on three of the option buildings had already been completed. Sarang's argument that the trial court's monetary judgment included amounts for work not yet completed also lacks merit. National's total bid for soil remediation work was $511,180 for base work and $518,000 for option work, for a total of $1,029,180. The trial court's award of $900,945 included the $511,180 due National under the base bid, as well as the partial amount due for the option work which had already been performed. Accordingly, we hold the trial court did not err in confirming the arbitration award and entering judgment in favor of National.

Finally, Sarang contends the arbitration award violates public policy by enforcing a demolition subcontract that contradicts the provisions of the joint venture agreement and SBA regulations which require a minority contractor to perform a specified percentage of the work.

In addition to the statutorily provided reasons for vacating an arbitration award, the courts have recognized a public policy exception, which is grounded in the common law. American Federation of State, County & Municipal Employees v. Department of Central Management Services, 173 Ill. 2d 299, 306-07 (1996) (AFSCME). This exception, however, is narrow and invoked only when there has been a clear contravention of a well-defined, dominant and public policy that is ascertainable from the laws and legal precedents and not from generalized considerations of supposed public interests. AFSCME, 173 Ill. 2d at 307. Application of the public policy exception requires a two-step analysis: (1) whether a well-defined and dominant public policy has been identified; and (2) if so, whether the arbitrator's award violates that public policy. AFSCME, 173 Ill. 2d at 307-08.

We find Sarang has failed to meet its burden by not identifying a well-defined and dominant public policy. In fact, it its opening brief, Sarang noted it was unable to locate any

decisions which hold that financial concerns violate public policy. Accordingly, we find the arbitration award did not violate public policy.

For the foregoing reasons, the judgment of the circuit court confirming the arbitrator's award is affirmed.

Affirmed.

GARCIA, P.J., and WOLFSON, J., concur.