2024 IL App (1st) 232341-U

Fourth Division
Filed August 15, 2024

No. 1-23-2341

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| VILLAGE OF STEGER, ILLINOIS, an Illinois Municipal Corporation, <br><br>     Petitioner-Appellant, <br><br>   v. <br><br> ILLINOIS FRATERNAL ORDER OF POLICE LABOR COUNCIL, RONALD WOODSON, and BRIAN CLAUSS, <br><br>     Respondents <br><br> (Illinois Fraternal Order of Police Labor Council, Respondent-Appellee). | Appeal from the <br> Circuit Court of Cook County <br><br> No. 2022 CH 10814 <br><br> The Honorable Caroline Kate Moreland, Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held:* The circuit court's order denying the petition to vacate an arbitration award requiring the employer to reinstate a terminated employee was affirmed where it derived its essence from the collective bargaining agreement and did not violate public policy.

¶ 2    Petitioner, the Village of Steger, petitioned to vacate an arbitrator's decision in favor of respondent, the Illinois Fraternal Order of Police Labor Council (the FOP), requiring the Village to reinstate Ronald Woodson's employment as a police officer with the Village. The circuit court denied the petition. The Village appeals, and we affirm.

¶ 3                                    BACKGROUND

¶ 4     The issue in this case arises under a collective bargaining agreement (CBA) originally entered into between the Metropolitan Alliance of Police (whose role as collective bargaining representative was assumed by the FOP after a July 2020 election) and the Village of Steger that came into effect on November 6, 2018. There are three specific provisions relevant to this case.

¶ 5     First, Section 1.2 of the CBA recognized an eighteen-month probationary period for new officers. During the probationary period, an officer was "subject to discipline, including discharge, without cause and with no recourse to the grievance procedure or any other forum." Otherwise, probationary officers were "entitled to all other rights, privileges, and benefits conferred by" the CBA.

¶ 6     Second, Section 16.1 of the CBA provided for a disability benefit identical to the statutory benefit conferred by the Public Employee Disability Act (5 ILCS 345/0.01 to 2 (West 2020)):

> "For the purposes of this Section, 'eligible employee' means any full-time employee.
>
> An eligible employee who suffers any injury in the line of duty which causes him to be unable to perform his duties, shall be governed by the provisions of the Public Employee Disability Act ("PEDA"), 5 ILCS 345/1, and any other applicable laws."

That statute provides, in relevant part:

> "Whenever an eligible employee suffers any injury in the line of duty which causes him to be unable to perform his duties, he shall continue to be paid by the employing public entity on the same basis as he was paid before the injury, with no deduction from his sick leave credits, compensatory time for overtime accumulations or vacation, or service credits in a public employee pension fund during the time he is unable to perform his duties due to the result of the injury, but not longer than one year in relation to the same injury *** ." 5 ILCS 345/1(b) (West 2020).

¶ 7 Third, Section 11.1 of the CBA set out the procedure for resolving any disagreements "involving the meaning, interpretation, or application of the provisions of" the CBA. The first step called for the affected employee, to, with or without a union representative, submit a written grievance to the chief of police. If the chief of police did not "adjust[ ]" the grievance, then the second step would be to submit it to the mayor. If the mayor's decision did not satisfy the union, it could then submit the dispute to arbitration. The CBA limited the arbitrator's power "to the interpretation and application of the written terms of this Agreement," which the arbitrator had no authority to change. The arbitrator was authorized to "decide only the specific issue raised by the grievance as originally submitted in writing to the Village" and had "no authority to make his decision on any issue not so submitted to him." Upon finding "a violation of the Agreement," the arbitrator was to "determine an appropriate remedy," and the arbitrator's decision was "final and binding on the parties." A related provision in Section 13.2 authorized reinstatement as a remedy for termination, but "only if accompanied by a finding of a violation of the employee's substantive rights."

¶ 8 Ronald Woodson began working as a police officer for the Village on April 18, 2019. Under the CBA, he was considered a probationary employee for the first eighteen months of his employment (*i.e.* through October 17, 2020). Woodson was hurt while on duty in January 2020. The record does not disclose the nature of the injury, but it prevented him from performing his duties. For several months, the Village maintained Woodson's employment and continued to pay him, but in September 2020, an independent physician determined that Woodson needed surgery and six more months of recovery before returning to work. Five days later, on September 23, the Village fired Woodson.

¶ 9 The next day, the FOP filed a grievance alleging that the Village had violated Section 16.1 when it "failed to pay disability benefits to Officer Nathan Woodson." The grievance was ultimately submitted to arbitration, where the issue was framed as "whether the Employer violated the Agreement when it discharged Grievant, and if so, what remedy." The arbitrator determined that, because the CBA incorporated the Public Employee Disability Act, he had the authority to

decide whether the Village had violated that statute's provisions. On the merits, he found that, regardless of Woodson's probationary status, he was still a full-time employee and therefore eligible for the benefit conferred by the Public Employee Disability Act, as incorporated in the CBA. Because that benefit requires the employer to continue the injured employee continue to be paid for up to one year following the injury, the arbitrator found that the Village violated the CBA by terminating Woodson's employment only nine months after Woodson's injury. For those reasons, the arbitrator granted the grievance and ordered that Woodson "be made whole." After the parties sought clarification about the remedy, the arbitrator specified that the Village was required to reinstate Woodson's employment. Finding that the purpose of Public Employee Disability Act was to "ensure[ ] that the employment relationship is maintained for a year to allow an injured officer *** to recover," the arbitrator rejected the Village's argument that Woodson could be made whole by simply paying out his salary for the remaining one-year period.

¶ 10    The Village then filed a petition to vacate the award in the circuit court on the ground that the arbitrator had exceeded his power and contravened public policy by ordering reinstatement, which, it argued, was not an available remedy under the Public Employee Disability Act. The circuit court denied the petition. It determined that the arbitrator did not exceed his authority because the award derived its essence from his interpretation of the CBA, and it found that the Village had not shown that reinstatement violated an explicit and well-defined public policy. In support of the latter conclusion, the circuit court cited, as persuasive authority, the unpublished decision in *Village of Bolingbrook v. Metropolitan Alliance of Police, Bolingbrook Police Officers Chapter #3*, 2023 IL App (3d) 220193-U, for the proposition that "employees paid pursuant to [the Public Employee Disability Act] are to maintain their employment status." See *id.* ¶ 6.

¶ 11                                    ANALYSIS

¶ 12    On appeal, the Village alleges two errors. First, it asserts that the circuit court "improperly enforced an arbitral award that was in contravention of an explicit and well-defined public policy." Second, it complains that the circuit court improperly relied on an unpublished decision to

conclude that the award was not contrary to public policy. Whether an arbitration award violates public policy is a question of law that we review *de novo. City of Des Plaines v. Metropolitan Alliance of Police, Chapter No. 240*, 2015 IL App (1st) 140957, ¶ 20.

¶ 13    Initially, we reject the Village's contention that the circuit court's reliance on the unpublished decision in *Village of Bolingbrook*, 2023 IL App (3d) 220193-U, was error. When our review is *de novo*, as it is here, the only question is whether the circuit court's judgment was correct; the reasoning it used to support that judgment is not relevant to our analysis. See *Khan v. Fur Keeps Animal Rescue, Inc.*, 2021 IL App (1st) 182694, ¶ 25. Additionally, it was not at all improper for the circuit court to rely on *Village of Bolingbrook*. While unpublished Rule 23(b) orders are not precedential, any such orders entered on or after January 1, 2021, "may be cited for persuasive purposes" by any party. Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023). Here, the FOP cited *Village of Bolingbrook* in its response to the Village's petition, as it was permitted to do by Rule 23(e). The court was not bound by that unpublished decision, but it was entitled to consider it for its persuasive value.

¶ 14    Turning to the merits, the Village argues that the arbitration award should be vacated because it is contrary to public policy. Specifically, the Village contends that the benefit conferred by the Public Employee Disability Act is limited to pay and that the statute does not authorize the reinstatement remedy chosen by the arbitrator in this case.

¶ 15    Arbitration awards are subject to "extremely limited" judicial review. *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 304 (1996) (*AFSCME*). This is especially true when the underlying arbitration was conducted in accordance with a collective bargaining agreement, as is the case here. Generally, "a court is duty bound to enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement." *Id.* at 304-05. The only exceptions are those recognized at common law. *Board of Education of the City of Chicago v. Chicago Teachers Union, Local No. 1*, 86 Ill. 2d 469, 474 (1981); see 710 ILCS 5/12(e) (West 2020). One such exception is for arbitration awards that

contravene public policy. Just as a court will not enforce a contract "that is repugnant to the established norms of public policy," a court "may not ignore the same public policy concerns when they are undermined through the process of arbitration." *AFSCME*, 173 Ill. 2d at 306-07. This exception is narrow, and it applies only when it is clearly shown that the arbitrator's interpretation of the collective bargaining agreement, as reflected by the award, violates an "explicit public policy." *Id.* at 307.

¶ 16    A claim that an arbitration award should be vacated as contrary to public policy requires a two-step inquiry. We first "determine if there is a well-established and dominant policy implicated by the arbitration award." *City of Des Plaines*, 2015 IL App (1st) 140957, ¶ 22; see *AFSCME*, 173 Ill. 2d at 307. We then "determine whether the arbitrator's award, as reflected in his interpretation of the [collective bargaining] agreement, violated the public policy" identified at the first step. *AFSCME*, 173 Ill. 2d at 308. Although "[t]his inquiry 'is necessarily fact dependent,' " the question is one of law. *City of Des Plaines*, 2015 IL App (1st) 140957, ¶ 20 (quoting *AFSCME*, 173 Ill. 2d at 311).

¶ 17    Our state's public policy is ascertained principally from its constitution and statutes, although it may also be found in judicial decisions and the consistent practices of government officials. *AFSCME*, 173 Ill. 2d at 307. Here, the public policy relied on by the Village is the one expressed in section 1(b) of the Public Employee Disability Act itself:

> "Whenever an eligible employee suffers any injury in the line of duty which causes him to be unable to perform his duties, he shall continue to be paid by the employing public entity on the same basis as he was paid before the injury, with no deduction from his sick leave credits, compensatory time for overtime accumulations or vacation, or service credits in a public employee pension fund during the time he is unable to perform his duties due to the result of the injury, but not longer than one year in relation to the same injury." 5 ILCS 345/1(b) (West 2020).

Eligible employees include police officers, firefighters, correctional officers, and a handful of other public workers who take on unusually dangerous duties. *Id.* § 1(a). The statute, therefore, expresses a public policy in favor of ensuring that those who accept those risks for the public's benefit do not lose their paychecks, sick leave, personal time off, or progress toward pension benefits when they suffer an injury in the line of duty that temporarily prevents them from working. See *id.* § 1(d) (prohibiting other employment during injury). There can be no serious dispute that the arbitrator's award here did not contravene that policy.

¶ 18    The Village, however, argues the Public Employee Disability Act expresses not only a public policy in favor of the benefit it provides but also against any further benefits for the injured employees it protects. Even accepting the premise that the section 1(b) disability benefit is limited to pay and does not require continued employment—which, to be clear, we express no view on— that hardly represents a public policy *against* more generous disability benefits. Taken seriously, the Village's argument would mean that the minimum benefit required by the Public Employee Disability Act is also a cap. A firefighter's union would not, for instance, be able to bargain for a two-year benefit in exchange for a modest reduction in pay; the resulting collective bargaining agreement would violate the supposed public policy against extending disability benefits for more than one year. We simply cannot agree that a statute that is plainly designed to promote the welfare of police officers (and others) who are hurt in the line of duty represents a public policy against doing anything more than the bare legal minimum.

¶ 19    In fairness, the absurdity of the Village's argument is an unavoidable side effect of trying to force a round peg through a square hole. Although couched in terms of public policy, the Village's true complaint is that the arbitrator's interpretation of the collective bargaining agreement's disability provision, which incorporated the Public Employee Disability Act by reference, was too generous. That may be a reasonable argument, but it is not the question before us. By entering into the CBA, the Village agreed to have an arbitrator, not the courts, resolve disputes over "the interpretation and application" of the CBA's provisions and to "determine an appropriate remedy" for any violations. See *AFSCME*, 173 Ill. 2d at 305 ("Because the parties

have contracted to have their disputes settled by an arbitrator, rather than by a judge, it is the arbitrator's view of the meaning of the contract that the parties have agreed to accept."). Our role is limited to verifying that the arbitrator's award "derive[d] its essence" from the CBA. *Id.* at 306. And here, it did: the arbitrator interpreted the CBA as incorporating the Public Employee Disability Act's one-year disability benefit, he interpreted that benefit as requiring maintenance of the employment relationship during the benefit period, and he found that terminating Woodson's employment was, therefore, a violation of the CBA. Whether or not we agree with it, the arbitrator's interpretation plainly drew its essence from the CBA itself. See *id.* at 305 ("We will not overrule that construction merely because our own interpretation differs from that of the arbitrator."). Similarly, because the CBA contemplated that the remedy for any violation would be determined by the arbitrator, we "have no authority to disagree with his honest judgment in that respect." *Id.* at 306. And, as we have already explained, neither the arbitrator's understanding of the Public Employee Disability Act, as incorporated in the CBA, or his selection of reinstatement as a remedy contravened public policy. For those reasons, the Village's petition to vacate was properly denied.

¶ 20                                     CONCLUSION

¶ 21    Because the arbitrator's award directing the Village to reinstate Woodson derived its essence from the CBA and was not contrary to public policy, we affirm the circuit court's judgment denying the Village's petition to vacate the arbitration award.

¶ 22    Affirmed.